In the Matter of JOHN TOM ROSS and
PETER FLANGAS, Attorneys at Law.

No. 11114

January 5, 1983 656 P.2d 832

[Rehearing denied September 12, 1983]

*F. DeArmond Sharp,* President, State Bar, Reno; *J. Roger Detweiler,* Executive Director, State Bar, Reno; and *Kent Robison,* Reno, for State Bar.

*Beckley, Singleton, DeLanoy & Jemison,* Las Vegas; and *Robert A. Grayson,* Carson City, for John Tom Ross.

*David Goldwater,* and *Peter L. Flangas,* in proper person, Las Vegas, for Peter L. Flangas.

## OPINION

*Per Curiam:*

In these proceedings, this court is called to review determinations of the State Bar of Nevada's Board of Governors, which has recommended to us that attorney John Tom Ross should

be disbarred, that attorney Peter L. Flangas should be suspended from the practice of law for two years, and that each of them should be fined one-half of the costs the State Bar has incurred through investigating and processing charges against them.[1] For the reasons stated below, we are constrained to hold that the proceedings against the aforesaid attorneys derogated their right to due process of law, as guaranteed by the Constitution of the United States. Accordingly, we grant the motions of attorneys Flangas and Ross to dismiss the proceedings against them.

I

## HISTORICAL BACKGROUND OF THE CASE

This matter arose from probate proceedings involving the estate of Walter E. Herrmann, who died on January 20, 1973, leaving substantial properties in Nevada and California. Over five years later, in March of 1978, this disciplinary proceeding was commenced by the filing of a complaint with the State Bar's Board of Governors which accused Flangas and Ross, as attorneys for non-resident heirs, together with the attorney for the estate's executor, of misconduct in connection with the probate proceedings and subsequent inquiries into the propriety of their fees.

The matter has a tortuous history, which will only be traced in most material part. In November of 1973, District Judge Richard Waters of the First Judicial District Court, for the County of Lyon, awarded the total sum of $70,000 to Flangas and Ross, whom Judge Waters had previously appointed to represent the non-resident heirs of the Herrmann Estate. From the record, it appears that Flangas and Ross had performed services of benefit to the Herrmann Estate. It also appears, however, that at least part of their services were of no benefit to the non-resident heirs, to whom Walter Herrmann had bequeathed specific sums of money. Thus, apparently for that reason, when the executor filed his account and petition for fees, Judge Waters ordered that the fees to Flangas and Ross should be paid from the general estate. Under Judge Waters's order, the specific bequests to the non-resident heirs bore no portion whatever of the fees awarded to Flangas and Ross.[2] This fact should be noted explicitly, inasmuch as numerous stories have been generated in the news media, comparing the size

---

[1] The amount claimed by the State Bar as costs is some $34,000, much of which was expended in an investigation of charges which, as noted hereinafter, the Board of Governors has determined to be unjustified and without factual foundation.

[2] Therefore, the non-resident heirs did not, and have not, objected to the amount of the fees which Judge Waters awarded to Flangas and Ross.

of the fees to Flangas and Ross with the specific bequests made by the decedent to the non-resident heirs.

Not long after fees were awarded to Flangas and Ross, Judge Waters died. A successor judge was named to fill Judge Waters's office until the next general election. He assumed control of the Herrmann Estate matter, and in time came to believe that the award of fees resulted from a corrupt conspiracy between Judge Waters, Flangas, Ross, and the executor's attorney. Thereupon, the successor judge telephoned the State Bar's president to solicit the investigation which culminated in the instant proceedings. After consulting with the successor judge, the State Bar president hired an investigator from Sacramento. These circumstances are summarized in a letter, in the nature of a status report, which the State Bar president wrote to his own successor:

> I received a call from [the successor judge], who indicated that it was obvious to him that his predecessor, [the attorney] representing the estate together with Peter Flangas and John Tom Ross, were involved in a conspiracy to extract exorbitant fees from this estate. He had no place else to look for assistance and asked if the State Bar would be willing to conduct an investigation into the entire matter. Thereafter, with the assent of the Board, I hired Jim Sims, who is a competent private investigator from Sacramento.
>
> I felt at that time that this investigation would serve a dual purpose:
>
> A. To assist the Court.
>
> B. To determine if counsel involved had been guilty of unethical conduct which could either lead to their receiving a reprimand, suspension or disbarment.
>
> Appreciating the fact that this might entail the spending of some State Bar dues to assist the Court, I felt we were justified in proceeding in the manner in which we have. *I had in mind also that later perhaps we could petition the Court to recoup some of the expenses which have been involved, if, as a matter of fact, we could ultimately prove that there was unethical conduct involved* and by virtue of this fact the assets of the estate were not diminished due to the conduct of counsel.
>
> . . .
>
> I am enclosing four bills from Jim Sims which somehow I misplaced which are in line for payment. *I appreciate the fact that we have spent considerable money to date but, under these circumstances, I think the expenditures are justified.*

(Emphasis added.)

The State Bar pursued a lengthy investigation attempting to validate the successor judge's suspicions about conspiracies. It appears that the successor judge assumed an active role in these inquiries, meeting privately with the Bar's investigator, one Sims, and channeling his activities. Flangas and Ross, as well as the attorney for the Herrmann Estate's executor, ultimately were charged and brought to hearing before the State Bar's Board of Governors.

After an eight-day hearing in the summer of 1978, the Board of Governors absolved all three attorneys of every allegation originally conceived by Judge Waters's successor. The Board of Governors found that there was neither evidence to justify any of several charges of conspiracy and related impropriety involving Judge Waters and the Herrmann Estate attorneys, nor evidence to substantiate a charge involving a political plot by Flangas against the successor judge. On the basis of a welter of conflicting evidence, however, the Board of Governors found that Flangas and Ross had been untruthful in regard to aspects of the inquiries into the successor judge's unsupportable suspicions. Hence, the Board of Governors determined to recommend that Flangas and Ross should be disciplined.

Under rules promulgated by this court, bar disciplinary proceedings are required to remain confidential pending our review. Nonetheless, almost immediately following conclusion of the Board of Governors' deliberations, and long before the Board had formulated and filed its legally confidential "Decision and Recommendation" with this court on September 11, 1978, distorted and inflammatory stories concerning the proceedings began surfacing in the news media. Therefore, after the formal "Decision and Recommendation" ultimately was filed with this court, Flangas and Ross moved to require more specific findings of fact, and requested an investigation into the breaches of confidentiality which were undermining the accused's rights. On October 19, 1978, the court convened with counsel in chambers, and elicited an agreement that the Board of Governors would prepare specific findings.[3] The court took no action, however, on complaints concerning the aforementioned breaches of confidentiality.

A few days afterward, election campaign advertising began to appear in the print and electronic media throughout Nevada, alluding to the pending Herrmann Estate proceedings, and to the successor judge's role in these pending proceedings, as a basis for lauding the successor judge's candidacy for election to this court. Flangas again petitioned this court for protection,

[3]On January 19, 1979, the Board filed with this court "Supplemental Findings of Fact," attempting to delineate more specifically their factual findings concerning Flangas and Ross.

but relief was denied in an order executed by two court members, with one justice dissenting.

This history has given rise to a plethora of issues. Flangas sued for violation of his civil rights in the United States District Court for Nevada, moving for an injunction against further proceedings in this court on the ground that the unlawful media "leaks," the improper campaign advertising, and other judicial misconduct, had destroyed prospects for due process in our state court system. The United States District Court for Nevada enjoined us from proceeding. On appeal, however, the Ninth Circuit Court reversed, holding that federal intervention would be unwarranted until Flangas and Ross have exhausted possibilities for just treatment in this tribunal. *See:* Flangas v. State Bar of Nevada,-655 F.2d 946 (1981).

## II

## *CURRENT STATUS OF THE CASE*

Following the granting of various motions for extension of time, attorney Ross filed a petition for review of the Board's decision on October 3, 1979. Briefing was completed on the Ross petition on April 16, 1980. Among other things, Ross contends that the conduct of the hearing by the Board of Governors of the State Bar of Nevada, the body primarily responsible for the finances of the Bar, violated his due process right to an impartial tribunal, because the Board could only recoup its considerable expenses of the proceedings if charges of misconduct were sustained. In May, 1980, petitioner Ross filed a motion for a "Pre-Hearing Conference," containing *inter alia* subordinate requests for (1) the granting of its prior unopposed motion for a precise statement by the Bar of the costs of the proceedings, characterized as "critical" to petitioner's due process argument, and (2) the bifurcation of argument so as to allow the court to consider his threshold constitutional argument separately and preliminarily, perhaps sparing the court the necessity of *de novo* review of some 2310 pages of transcript and over 200 documents contained in the "Exhibits."

On December 9, 1981, attorney Flangas filed a "Motion to Dismiss and Quash the Decision and Action of the Board of Governors," also asserting the due process argument advanced by petitioner Ross.[4] Attorney Ross later joined in this motion. In order that we might consider the threshold question thus raised, we required the State Bar to submit a precise itemization of the costs of proceedings.

---

[4]No petition for review has as yet been filed by attorney Flangas.

## III

### *ANALYSIS OF THRESHOLD LEGAL ISSUE*

The United States Supreme Court has made it clear that "[t]he Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980). It has further said: "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.' " Withrow v. Larkin, 421 U.S. 35, 48 (1974); Gibson v. Berryhill, 411 U.S. 564 (1973).

In Tumey v. Ohio, 273 U.S. 510 (1927), the court reversed convictions by a mayor whose salary was paid in part out of fees and costs levied by him in adjudicatory proceedings. As the court pointed out the following year, however,

> the mayor's individual pecuniary interest in his conviction of defendants was not the only reason in the *Tumey* case for holding the Fourteenth Amendment to be violated. Another was that a defendant brought into court might with reason complain that he was not likely to get a fair trial or a fair sentence from a judge who as chief executive was responsible for the financial condition of the village . . . and who by his interest as mayor might be tempted to accumulate from heavy fines a large fund by which the running expenses of a small village could be paid, improvements might be made and taxes reduced. This was thought not to be giving the defendant the benefit of due process of law.

Dugan v. Ohio, 277 U.S. 61, 64-65 (1928).

In Ward v. City of Monroeville, 409 U.S. 57 (1972), the court dealt with the issue of whether trial before a mayor who also had executive responsibility for the village budget and finances was consistent with the guarantees of the due process clause when the revenue produced from the mayor's court provided a *substantial portion of village funds*. The court once again noted that in *Tumey*, "[t]he fact that the mayor . . . shared directly in the fees and costs did not define the limits of the principle." 409 U.S. at 60. Rather, the court reiterated, "the test is whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused. . . .' " *Id.,* quoting

Tumey v. Ohio, *supra,* 273 U.S. at 532. The court held that such "possible temptation" might exist, even in the absence of any direct, personal pecuniary interest on the part of the adjudicator, when his "executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." 409 U.S. at 60.

Flangas and Ross argue that *Ward* is directly applicable to this disciplinary proceeding, since the adjudicatory hearing, factual findings and recommendations were all undertaken, as the Supreme Court Rules then permitted,[5] by the Board of Governors of the State Bar of Nevada, the body with primary responsibility for the finances of the Bar Association.

As Flangas and Ross point out, the same group which was permitted to "try the accused" in a disciplinary matter, pursuant to former SCR 104(7), was also the group "charged with the executive functions of the state bar," SCR 85, including responsibility for revenues, expenditures, and management of the bar's finances. *See* SCR 85(2); former SCR 86(1), (2), (3), (4), (12), and present SCR 86(1), (2), (3), (4), and (11), eff. Feb. 15, 1979. Most significantly, under former SCR 105(1), the Board of Governors was given power "for any of the causes set forth in [the Supreme Court] rules warranting [discipline]" to assess or recommend the assessment of costs or the imposition of fines on disciplines. All fines, assessments and costs were paid directly to the State Bar treasury. Former SCR 86(7).

As reflected by a supplemental record submitted by the State Bar pursuant to order of this court, the total costs which the Bar claims to have incurred in the "Herrmann Estate Disciplinary Matter," and which it seeks to recover from Flangas and Ross, amount to some $34,000. The record before us also shows that in the fiscal year ending September 30, 1978, during which charges against Flangas and Ross were heard, the State Bar enjoyed total revenues of only $177,494, while expending $204,650, with a resulting deficit of $27,156. In other words, the assessment sought against Flangas and Ross was equal to nearly 20 percent of the State Bar's total revenue, and would more than have defrayed its yearly deficit.

---

[5]At the time of this hearing, the applicable Supreme Court Rule, former SCR 104, permitted disciplinary proceedings to be instituted before the Board of Governors, or in the Supreme Court, as well as before a local administrative committee. This rule was repealed, effective February 15, 1979, when the Bar disciplinary procedure was substantially revised. Such hearings are now conducted by panels of two disciplinary boards created by SCR 103, on which members of the Board of Governors are expressly precluded from sitting, SCR 103(1). The role of the Board of Governors in disciplinary matters is now limited to the hearing of complaints against bar counsel or staff, SCR 104(2), and review on the record of disciplinary board decisions to dismiss complaints, SCR 105(1)(a).

Counsel for the Board of Governors has cited a number of cases in support of his argument that the procedure used in this case did not violate the constitutional due process standard of *Tumey* and *Ward*. Upon examination, however, none of these cases involves the combination of adjudicatory and executive functions addressed by the court in *Ward* and presented by the facts of this case.

In two of the cases cited by counsel for the Board of Governors, courts held that judges were not precluded, by virtue of their own membership in state bar associations, from hearing disciplinary matters brought by those bar associations. Ex Parte Alabama State Bar Ass'n, 8 So. 768 (Ala. 1891); State v. Rhodes, 131 N.W.2d 118 (Neb. 1964). Both cases, in other words, dealt with mere membership of the judicial officer in the state bar association prosecuting the charges, rather than with a situation in which a judicial officer also had responsibility for the finances of the organization. This is also true of the cases cited by counsel for the Board as analogous, though dealing with other professional organizations. *See:* State Board of Dental Examiners v. Miller, 8 P.2d 699 (Colo. 1932); State v. Churchwell, 195 So.2d 599 (Fla.App. 1967); Bruce v. Department of Registration and Education, 187 N.E.2d 711 (Ill. 1963); Wagner v. Ezell, 154 S.E.2d 731 (S.C. 1967).

The issue presented here, however, is illustrated by City of Boston v. Baldwin, 1 N.E. 417 (Mass. 1885), cited by petitioner Ross. In *Baldwin,* the Massachusetts court held that although a mere inhabitant of Boston would not be precluded from sitting on a jury where the city was a party, a member of the commonwealth council was required to be excluded, since it was his particular ''duty . . . as a part of the government, to guard and protect the rights of the city.'' *Id.* at 418. *See also* State ex rel. Colcord v. Young, 12 So. 673 (Fla. 1893) (judge precluded from sitting on matter in which church, of which he was vestryman, had interest); Meyer v. Niles Tp., Ill., 477 F.Supp. 357 (N.D.Ill. 1979) (violation of due process for township supervisors to rule upon eligibility of applicants for medical assistance, paid from general township funds).

Here the members of the Board of Governors, like the mayor in *Ward* or the councilman in *Baldwin,* collectively have a particular responsibility and duty to protect the financial integrity of the bar association. This distinguishes their position from that of a mere member of the bar association. It is the potential impact of this duty and responsibility upon the ability of a factfinder ''to hold the balance nice, clear and true'' which was of concern to the Supreme Court in *Ward* and which is at issue. here.

The final case cited by the Board is also inapposite. In re

Osborn, 376 F.2d 808 (6th Cir. 1967), held that it was not a violation of due process for a judge to institute and then to hear a disbarment proceeding. The question of the propriety of a combination of prosecutorial and adjudicatory functions has in fact been addressed by this court previously, though not labeled as such. In the bar discipline case of In re Scott, 53 Nev. 24, 43, 292 P. 291 (1930), the court concluded that a statute was not invalid which allowed a member of a local administrative committee, or of the board of governors, to prefer charges against an attorney and then to sit as a member of the committee or board in judgment of the same charge. *See* Withrow v. Larkin, *supra.*

This issue, like the issue of mere membership, is not presented here. The question is not whether the Board improperly combined adjudicatory and prosecutorial functions, but whether it improperly combined adjudicatory and executive functions, in contravention of the standard of *Ward. In re Osborn* is therefore of no help to the Board.

Counsel for petitioner Ross points out that there are two possible exceptions to the dictates of *Ward.* First, the rule of necessity, and, second, a pecuniary interest too remote or insubstantial. It appears that neither of these exceptions is applicable here.

The rule of necessity is called into play when the strict application of a rule of disqualification would leave the parties without a forum. *See, e.g.,* Atkins v. United States, 556 F.2d 1028 (Ct.Cl. 1977). The rule has, in fact, been applied to preclude disqualification of judges who were members of a state bar association from hearing a bar disciplinary matter. State v. Rhodes, *supra,* 131 N.W.2d at 125. It is, however, clearly inapplicable here. As noted above, the rules then provided two alternative adjudicatory proceedings, neither of which involved a group with direct executive responsibilities for bar finances in the initial fact finding process: hearings before the local administrative committees, or before the Supreme Court itself. It may also be noted that the Board plays no comparable fact-finding role under the current disciplinary rules. There can be, therefore, no legitimate argument that the rule of necessity should excuse compliance with the standard of *Ward.*

The second exception is derived from Dugan v. Ohio, *supra.* There, the court held that a mayor's court did not violate due process where, although fines were deposited in the city's general fund, the mayor's salary was unrelated to convictions or fines imposed, and he had as mayor no specific executive responsibilities. As the court later summarized this holding in

*Ward,* 409 U.S. at 61-62, "the Mayor's relationship to the finances and financial policy of the city was too remote to warrant a presumption of bias toward conviction in prosecutions before him as judge." *In accord, see:* Burleigh v. State Bar of Nevada, 98 Nev. 140, 643 P.2d 1201 (1982) (proceedings before disciplinary panel, which was not charged with executive responsibilities relating to the State Bar's budget, held not to offend due process). Of course, the facts of this case rather parallel the situation of the mayor in *Ward,* in that the Board of Governors does have direct responsibility for the "finances and financial policy" of the bar association.

Though counsel for the Board does not argue this point, it might be suggested that the court should apply the less stringent standard recently announced by the Supreme Court in Marshall v. Jerrico, Inc., *supra,* as applicable to an administrative agency performing a prosecutorial rather than an adjudicatory function. After determining that the agency's function was in fact prosecutorial, the court concluded that any potential "biasing influence" in the challenged statutory procedure was "too remote and insubstantial to violate the constitutional constraints applicable to the decisions of an administrator performing prosecutorial functions." 446 U.S. at 243-44. In this case, however, the Board performed much more than a merely prosecutorial function, and in any event dealt with a matter involving a financial impact considerably more substantial than that involved in Marshall v. Jerrico.

In Marshall v. Jerrico, the court concluded that the function of an assistant regional administrator for the Employment Standards Administration of the Department of Labor "performs no judicial or quasi-judicial functions. He hears no witnesses and rules on no disputed factual or legal questions. The function of assessing a violation is akin to that of a prosecutor or civil plaintiff." 446 U.S. at 247. Similarly, a federal district court in E.E.O.C. v. Sears, Roebuck & Co., 504 F.Supp. 241 (N.D.Ill. 1980), concluded that the agency involved there neither heard witnesses nor ruled on factual or legal questions, and therefore should be judged by prosecutorial standards.

Here, the function performed by the Board is clearly more akin to the judicial than a prosecutorial role. The rules themselves referred to the Board's power to "try the accused." Former SCR 104(7). These proceedings were conducted according to the Nevada Rules of Civil Procedure, and the Nevada Evidence Code, in a full adversary proceeding with a designated "prosecutor," as well as counsel for the accused, presenting witnesses and making factual and legal arguments to the Board. Most significantly, at the conclusion of the hearing, the Board made factual findings, on the basis of its resolution of

conflicting testimony by witnesses before it, and then made its recommendations. The Board thus clearly functioned in a quasi-judicial role.[6]

Furthermore, even should the prosecutorial standard be applied, the financial impact of a decision in this case is simply not comparable to that judged in Marshall v. Jerrico to be too remote and insubstantial. In Marshall v. Jerrico, the court noted the child labor penalties, assessment of which was claimed to present the basis for an unconstitutional potential for bias on the part of certain administrators, amounted to substantially less than 1 percent of the agency's budget during three years of operation. Moreover, in each of those years the agency did not spend the full amount of its appropriation, and in fact returned amounts to the Treasury exceeding the sums of child labor penalties collected. Though the law allowed it, none of the penalties had ever actually been allotted to the regional offices whose administrators were alleged to be affected by the potential for institutional gain in the assessment of the penalties.

In such circumstances, it is not surprising that the court in Marshall v. Jerrico said it "need not say with precision what

[6]Some confusion might be occasioned by this court's prior holding, *In re Scott, supra,* [53 Nev. 24, 292 P. 291 (1930)], that the Board of Governors did not perform a judicial function, because its decisions were "merely 'recommendatory' in character and the only orders which have the effect of working disbarment or suspension of a person are the final orders of the supreme court." 53 Nev. at 38, 292 P. at 295. The Board, or local administrative committee, was described as "an 'intermediary agency' for the taking of evidence and reporting thereon to this court." *Id.* at 42, 292 P. at 296. *See also* Haviland v. Foley et al., 55 Nev. 455, 39 P.2d 198 (1935); State ex rel. McCloskey v. Greathouse, 55 Nev. 409, 36 P.2d 357 (1934). However, in State Bar v. Raffetto, 64 Nev. 390, 183 P.2d 621 (1947), Justice Badt pointed out that *Scott* should be read in the context of the contention which had been made that the state bar act violated the constitutional provision regarding separation of powers by conferring judicial power upon the Board of Governors. Refusing to follow the literal language of *Scott,* suggesting that the Board's findings and recommendations were entitled to no influence with the court upon review, the court through Justice Badt declared that it was henceforth "prepared to accord persuasive force to the findings of fact and recommendations of the local administrative committee and the board of governors." 64 Nev. at 397, 183 P.2d at 624.

While continuing to recognize its obligations to review the entire record, this court has also continued to recognize the persuasive force of such findings, *see, e.g.,* In re Kellar, 88 Nev. 63, 493 P.2d 1039 (1972), and has required a petitioner for review to "affirmatively reveal wherein the findings and recommendations of the committee and board are erroneous and unlawful." In re Miller, 87 Nev. 65, 69, 482 P.2d 326, 328 (1971). Such status would, of course, certainly not be accorded a merely prosecutorial decision by any agency.

limits there may be on a financial or personal interest of one who performs a prosecutorial function, for here the influence alleged to impose bias is exceptionally remote." 446 U.S. at 250. The court understandably decided that there was simply not a "realistic possibility that the assistant regional administrator's judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts." *Id.* Such cannot be said here, where the significant cost figure for these proceedings—a very substantial portion of the State Bar's annual budget—could be recovered only upon a finding of misconduct.

Therefore, the adjudication by the Board would appear to fall within the proscription of *Ward,* unexcused by the rule of necessity and not within the exception established for an interest too remote or insubstantial, according to *Dugan* or Marshall v. Jerrico.

Two final points are worthy of comment. First, it should be noted that the United States Supreme Court has made it clear that the fullest review by this court would not "cure" a defective adjudicatory proceeding below. As the court held in *Ward,* a "trial court procedure [may not] be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance." 409 U.S. at 61-62. *See also* Gibson v. Berryhill, *supra,* 411 U.S. at 577.

Second, it should be stressed that we are dealing here not with a charge of actual bias, but with a challenge to a procedure as presenting a constitutionally unacceptable potential for bias, based upon the premise that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." Commonwealth Coat. Corp. v. Continental Cas. Co., 393 U.S. 145, 150 (1968). The United States Court of Appeals for the Fifth Circuit recently explored this point at some length in an opinion finding invalid a statutory system for compensating justices of the peace on the basis of the number of cases heard. Brown v. Vance, 637 F.2d 272 (5th Cir. 1981). The appellate court determined that the district court had improperly required the plaintiffs "to carry the burden of overcoming the presumption of honesty and integrity in those serving as adjudicators." *Id.* at 274. In *Tumey* and *Ward,* the Fifth Circuit concluded, the

Supreme Court "was not as interested in the probity of an individual judge or perhaps even, of the great majority of judges. It was interested rather in the inherent defect in the legislative framework arising from the vulnerability of the average man—as the system works in practice and as it appears to defendants and to the public." *Id.* at 284.

As the Supreme Court has said, *In re Murchison,* 349 U.S. 133, 136 (1955):

> Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "every procedure which would offer a possible temptation to the average man as judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Tumey v. Ohio,* 273 U.S. 510, 532. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14.

The procedure used here, formerly permitted by the rules governing bar disciplinary matters—in which the Board of Governors, the body responsible for the finances of the bar association, functioned as fact-finder in a quasi-judicial proceeding, involving costs which were substantial and which were recoverable by the State Bar only upon a finding of misconduct—appears to violate due process under the standard enunciated by the Supreme Court in Ward v. City of Monroeville, *supra.*

## IV

### CONCLUSION

Because doing so obviates the need to consider other more problematical legal and factual issues, we have determined to address first the threshold due process issue, which is discussed at length above. We have concluded the argument that the proceedings conducted herein violated the accused's right to due process of law is meritorious. Accordingly, petitioner Flangas'

Motion to Dismiss and Quash the Action of the Board of Governors, in which petitioner Ross has joined, is hereby granted. Proceedings against said attorneys are hereby dismissed.

SPRINGER, STEFFEN, and GUNDERSON, JJ., and ZENOFF, SR. J.,[7] concur.