NEVADA ATTORNEY GENERAL, FRANKIE SUE DEL PAPA, Petitioner, *v.* THE HONORABLE THOMAS L. STEFFEN, Chief Justice of the Nevada Supreme Court, THE HONORABLE CHARLES E. SPRINGER, Justice of the Nevada Supreme Court, THE HONORABLE DAVID ZENOFF, Senior Justice of the Nevada Supreme Court, in Their Official Capacities and HERBERT J. AHLSWEDE, in his Official Capacity as Special Investigator, Respondents.

No. 27847

April 25, 1996

915 P.2d 245

*Frankie Sue Del Papa,* Attorney General, Carson City, for Petitioner.

*Chuck R. Gardner,* Las Vegas, for Respondents.

## OPINION

*Per Curiam:*

Respondent Justices have appointed a "Special Master" to investigate alleged leaks of information to the press in violation of two early orders by a panel of this court directing that the proceedings before this court in Case No. 24598, "the Whitehead case," be kept confidential. We conclude that these orders mandating confidentiality were invalid and that Respondent Justices lack constitutional or legislative authority to appoint a special master to investigate the leaks of information to the media and the reason for this court's lost prestige. Accordingly, we grant Petitioner's petition for a writ of prohibition.

### FACTS

This petition for an extraordinary writ emanates from that portion of the Whitehead case in which Respondent Justices appointed a special master to investigate the sources of information leaks to the press in violation of the Whitehead panel's orders of confidentiality entered July 22 and 30, 1993. On September 1, 1995, Respondent Justices filed an order appointing Respondent Herbert F. Ahlswede to investigate and expose the sources of the press leaks and to inquire into the loss of public confidence, trust, and respect for the supreme court and the judicial system. Jerry Carr Whitehead v. Nevada Commission on Judicial Discipline, Docket No. 24598 (Order Appointing Special Master at 4, September 1, 1995). On September 15, 1995, this court entered an order which voided the order appointing the special master and prohibited payment of any costs or related expenditures; this court's order concluded that the Whitehead panel exceeded its jurisdiction by appointing the special master

and that the expenditure of funds in relation to the investigation was a waste of court resources. Petition for an Order Rescinding Appointment of Special Master Entered September 1, 1995, and Voiding Associated Expenses, ADKT No. 221 (Order Granting Petition and Vacating Order Appointing Special Master at 1-2, September 15, 1995). On December 15, 1995, the Whitehead panel entered an opinion declaring that the order filed by this court on September 15, 1995 was a nullity and of no legal force or effect. Whitehead v. Comm'n on Jud. Discipline, 111 Nev. 1459, 1461, 908 P.2d 219, 220 (1995).

Petitioner argues that the September 15, 1995 order entered by this court is competing with the December 15, 1995 opinion entered by the Whitehead panel, thus creating a constitutional crisis which the Petitioner has been drawn into by virtue of her office. Petitioner seeks a writ of prohibition declaring that this court mandate that Respondent Justices cease all action in Case No. 24598, the Whitehead case, in particular all action in furtherance of the unlawful investigation conducted by Special Master Ahlswede.

We find it unnecessary to ask for a response or further authority from Respondents in regard to this petition because we are well aware of their position on the relevant issues as stated in their opinions in the Whitehead case and in the administrative petitions concerning that case.

## DISCUSSION

*The propriety of issuing a writ of prohibition or in the alternative a writ of mandamus in this action*

A writ of prohibition will issue where a tribunal has acted without or in excess of the jurisdiction of such tribunal. NRS 34.320; Goicoechea v. District Court, 96 Nev. 287, 289-90, 607 P.2d 1140, 1141 (1980). The purpose of a writ of prohibition is to restrain "courts from acting without authority of law in cases where wrong, damage and injustice are likely to follow from such action." Olsen Family Trust v. District Court, 110 Nev. 548, 552, 874 P.2d 778, 781 (1994). Furthermore, a writ of prohibition will only issue when no plain, speedy, and adequate remedy exists at law. *Id.*

We conclude that a petition for an extraordinary writ is proper in this case and that this court should entertain the petition. It appears that Respondent Justices, by entering the confidentiality orders and by authorizing the special master to investigate the sources of breaches of those confidentiality orders, have acted in excess of their jurisdiction. Additionally, because this matter involves members of the highest court in this state, the writ is the

only avenue of relief for Petitioner, and no other plain, speedy or adequate remedy exists at law. Finally, the ongoing investigation poses a threat to certain fundamental constitutional rights and guarantees, including freedom of speech, due process, and separation of the branches of government, and therefore a recognized injury may result in the absence of a writ.

*The confidential orders were entered without jurisdiction to do so*

Respondent Justices appointed a special master to investigate alleged leaks of information to the press in violation of two early orders by the Whitehead panel directing that the proceedings before this court in the Whitehead case be kept confidential. We conclude that these orders were invalid because Respondent Justices acted in excess of their jurisdiction when entering them.

Respondent Justices have invoked the Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline (ARJD) as authority for the confidentiality orders. ARJD 5(1) provides: "All proceedings must be confidential until there has been a determination of probable cause and a filing of formal statement of charges." ARJD 5(2) provides that confidentiality "encompasses all proceedings of the commission and all information and materials, written, recorded or oral, received or developed by the commission in the course of its work and relating to alleged misconduct or disability of a judge." The Whitehead panel concluded that these rules also extended to judicial proceedings before this court after Judge Whitehead petitioned for extraordinary relief. The panel erred.

The scope of the ARJD is restricted to "the confidentiality of all proceedings *before the Nevada commission on judicial discipline* as imposed by § 21(5)(a) of article 6 of the constitution of Nevada, . . . and the conduct of investigations and hearings *by the commission,* as imposed by § 21(5)(c) of article 6 of the constitution of Nevada." ARJD 1 (emphases added). This restricted scope is required by the Nevada Constitution, which provides that this court shall make appropriate rules for "[t]he confidentiality of all proceedings *before the commission,* except a decision to censure, retire or remove a justice or judge." Nev. Const. art. 6, § 21(5)(a) (emphasis added). Overlooking the limiting language in this constitutional provision, Respondent Justices decided that the state public policy favoring confidentiality in initial judicial discipline proceedings is so strong that it prevails over any countervailing public policies to keep government open and the public informed, even when a judge avails himself of the traditionally public forum of this court and seeks to have all proceedings against him by the Commission on Judicial

Discipline dismissed. This view disregards not only the right and need of the public to know of such an extraordinary dispute in governmental affairs but also the threat that secret judicial proceedings pose to public confidence in this court and the judiciary.

NRS 1.090 provides: "The sitting of every court of justice shall be public except as otherwise provided by law." The State Constitution and the ARJD provide no authority for confidential proceedings before the supreme court itself, and the Whitehead panel erred in concluding that it had such authority.

Furthermore, the confidentiality orders implicate First Amendment concerns. The First Amendment prohibits Congress from making any law "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The Fourteenth Amendment makes this prohibition applicable to state actions as well. U.S. Const. amend. XIV, § 1. The First Amendment guarantees public access to places traditionally open to the public, such as criminal trials. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 577, 580 (1980). In *Richmond,* the Supreme Court noted that though the right to attend civil trials was not at issue before it, "historically both civil and criminal trials have been presumptively open." *Id.* at 580 n.17. A state may deny this right of public access only if it shows that "the denial is necessitated by a compelling government interest, and is narrowly tailored to serve that interest." Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607 (1982).

The Whitehead case did not involve a trial; nevertheless, at Judge Whitehead's behest, it became a judicial proceeding which implicated matters of great public concern. A major purpose of the First Amendment is to protect the free discussion of governmental affairs. Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 838 (1978). "The operations of the courts and the judicial conduct of judges are matters of utmost public concern." *Id.* at 839. Furthermore, open court proceedings assure that proceedings are conducted fairly and discourage perjury, misconduct by participants, and biased decision making. *Richmond,* 448 U.S. at 569. Openness promotes public understanding, confidence, and acceptance of judicial processes and results, while secrecy encourages misunderstanding, distrust, and disrespect for the courts. *Id.* at 569-73. Despite their concerns with the potential for unfair actions by the Commission, Respondent Justices have never acknowledged the potential for abuse inherent in their

attempt to proceed secretly in the Whitehead case. Despite their concerns with a loss of public confidence in this court, Respondent Justices have paid no regard to the distrust caused by their attempt to proceed secretly, by their intemperate reaction when that attempt was exposed, and by their obsessive preoccupation with avenging themselves against those who informed the press and the public of the case.

Respondent Justices' concern with Judge Whitehead's right to confidentiality and with possible harm to the judiciary from the publicizing of frivolous complaints against judges, though legitimate, does not constitute a compelling state interest that overrides the constitutionally protected rights of freedom of speech and press and access to the courts in a case of the highest public concern. The Whitehead panel thus issued its orders of confidentiality without authority and erroneously upheld their validity in later opinions.

Furthermore, Respondent Justices' efforts to identify and punish persons who provided information to the press are improper. Citing United States Supreme Court case law, the Whitehead panel stated that a court has authority to issue ancillary orders while considering other questions and to punish as criminal contempt violations of such orders even when it is later determined that the court lacked jurisdiction in the matter. Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 128, 136, 906 P.2d 230, 235 (1994). However, the panel overlooked contrary Nevada precedent holding that lack of subject matter jurisdiction renders a judgment void and that a person may not be held in contempt of a void order. State Indus. Ins. System v. Sleeper, 100 Nev. 267, 269, 679 P.2d 1273, 1274 (1984). The Whitehead panel's disregard of this court's precedent and of the application of the doctrine of stare decisis without explanation or comment was improper.

Consistent with *Sleeper*, the Supreme Court of California has stated:

> In this state it is clearly the law that the violation of an order in excess of the jurisdiction of the issuing court cannot produce a valid judgment of contempt, and that the "jurisdiction" in question extends beyond mere subject matter or personal jurisdiction to that concept described by us in Abelleira v. District Court of Appeal [109 P.2d 942, 948 (1941)]: "Speaking generally, any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of *stare decisis*, are in excess of jurisdiction, [. . . .]"

In Re Berry, 436 P.2d 273, 280 (Cal. 1968) (some citations omitted). Although the Whitehead panel had subject matter jurisdiction in the Whitehead case, it acted in excess of that jurisdiction under the First Amendment, NRS 1.090, and the ARJD in ordering that the proceedings in the Whitehead case before this court be kept confidential. Therefore, those orders were void, and their violation cannot produce a valid judgment of contempt.

*Respondents' appointment of a special master was not authorized*

Even if the orders mandating confidentiality had provided a valid basis for an investigation into the source of leaked information and this court's lost prestige, Respondent Justices lacked authority to initiate and oversee such an investigation.

On September 1, 1995, Respondent Justices entered an order appointing a special master whose duties included making "any and all inquiries into the causes for the loss of public confidence, trust and respect for the supreme court and for the judicial system which are related to the [Whitehead] matter." Jerry Carr Whitehead v. Nevada Commission on Judicial Discipline, Docket No. 24598 (Order Appointing Special Master at 4, September 1, 1995). More specifically, the special master was to "provide special attention to the interference with the administration of justice and the breaches of confidentiality that have so seriously impacted the efforts of this court to honorably, promptly, and effectively process the [Whitehead] matter," and to "conduct such investigations as shall be necessary to determine the sources of the unlawful breaches of confidentiality that may have occurred in [the Whitehead] proceedings and the extent to which they may have impacted on [Whitehead's] due process rights." *Id.* at 1, 4.

According to the September 1, 1995 order, the special master was to file the written results of this broad inquiry with the Whitehead panel and not to the five elected justices or the legislature. *Id.* Additionally, the special master was also required to file interim reports with the Whitehead panel and was permitted to seek direction from that panel at any time. *Id.* Furthermore, the powers of the special master were as broad as the scope of his investigation; the special master was declared an officer and agent of the Whitehead panel, was granted judicial immunity, and was given the power to administer oaths, to take depositions, and to issue subpoenas, subpoenas *duces tecum,* and orders to show cause. *Id.* at 5.

We conclude that Respondent Justices' order appointing the special master was improper for several reasons. Most impor-

tantly, Respondent Justices had no constitutional or other legislative authority to appoint a special master to investigate the causes for the loss of public confidence, trust and respect for the supreme court and for the judicial system, and more specifically to expose the sources of news leaks to the media.

"The Constitution of the State of Nevada distributes governmental power into the Legislative, Executive, and Judicial departments; and each department is separate from the others." Galloway v. Truesdell, 83 Nev. 13, 19, 422 P.2d 237, 241 (1967) (citing Nev. Const. art. 3, § 1).[1]

The court in *Galloway* acknowledged the dangers of permitting one branch of government to usurp the power of another branch:

> " '[t]here can be no liberty . . . if the power of judging be not separated from the legislative and executive powers. . . . Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would be the legislator: Were it joined to the executive power the judge might behave with all the violence of an oppressor.' "

*Id*. at 19, 422 P.2d at 242 (quoting City of Enterprise v. State, 69 P.2d 953, 957 (Or. 1937)(quoting Montesquieu).

This court has considered what constitutes legislative, executive, and judicial powers, and has concluded:

> [L]egislative power is the power of law-making representative bodies to frame and enact laws, and to amend and repeal them. . . .
>
> The executive power extends to the carrying out and enforcing the laws enacted by the legislature. . . .
>
> 'Judicial Power' . . . is the *authority* to hear and determine justiciable controversies. Judicial power includes the authority to enforce any valid judgment, decree, or order.

*Id*. at 20, 422 P.2d at 242.

Based on these definitions, we conclude that the investigation to expose the sources of news leaks to the media had nothing to do with the power of the judicial branch to hear and determine

---

[1]Article 3, section 1 of the Nevada Constitution states:

The powers of the Government of the State of Nevada shall be divided into three separate departments,—the Legislative,—the Executive and the Judicial; and no persons charged with the exercise of powers belonging to one of these departments shall exercise any functions, appertaining to either of the others, except in cases herein expressly directed or permitted.

justiciable controversies, and therefore respondents had no authority to initiate their investigation.[2] The power to initiate an investigation into who engaged in potentially criminal behavior by leaking information to the media in violation of the Whitehead panel's orders of confidentiality was an executive function reserved exclusively for the executive branch. By initiating the investigation, Respondent Justices improperly exercised the functions of the executive branch in violation of article 3, section 1, of the Nevada Constitution.

If Respondent Justices believed that someone had committed criminal contempt by leaking information regarding the Whitehead matter to the media in violation of that order, several investigatory bodies existed to which the matter could have been referred. If Respondent Justices believed that an attorney had disobeyed the court order, they could have referred the matter to the State Bar of Nevada, which is authorized to investigate complaints of misconduct and conduct disciplinary hearings on formal complaints of misconduct. SCR 104(7), 105. If Respondent Justices believed that a judge on this court had disobeyed the court order, they could have referred the matter to the Nevada Commission on Judicial Discipline, which is authorized to evaluate complaints relating to the fitness of a judge or justice. Nev. Const. art. 6, § 21. If Respondent Justices, because of the history of the Whitehead case, did not trust the Nevada Commission on Judicial Discipline to adequately investigate the complaint, they could have referred the matter to a district attorney's office or other law enforcement agency authorized to investigate alleged criminal activity, as they could have done if they believed that a private citizen not under the jurisdiction of the State Bar or the Judicial Discipline Commission had violated the orders. In any of these situations, Respondent Justices could also have asked a district attorney to seek an indictment from a grand jury. *See generally* NRS 172.145, 172.241.

Other relief was also available if Respondent Justices believed that a state employee had engaged in potentially criminal con-

---

[2]We note that the investigation at issue is in no way similar to the investigation conducted by JUSTICE STEFFEN in conjunction with the behavior of district judge Paul Goldman. Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992). In *Goldman,* JUSTICE STEFFEN conducted a "tentative inquiry" into district judge Goldman's behavior on the belief that the behavior might constitute an emergency requiring an administrative reapportionment of the public's judicial business. *Id.* at 257, 830 P.2d at 111. However, JUSTICE STEFFEN did not have authority to issue any subpoenas or show cause orders or to depose witnesses. Additionally, JUSTICE STEFFEN's investigation was narrowly tailored to focus upon the behavior of one judge, as compared to the investigation at issue which was virtually boundless in scope.

duct. If they believed that a state official had committed a "violation of trust," they could have petitioned a district court to impanel a grand jury to inquire into the matter. NRS 6.130(2). Similarly, Respondent Justices could have petitioned the governor to request that a district judge impanel a grand jury to investigate the conduct of state officials or employees or could have petitioned the legislature to pass a concurrent resolution ordering a district judge to do the same. NRS 6.135(1). Respondent Justices, however, chose none of these courses prior to launching their own unauthorized and illegal investigation.

Respondent Justices also argue that they were authorized to conduct such an investigation pursuant to Senate Concurrent Resolution No. 10, which reads in part:

> RESOLVED BY THE SENATE OF THE STATE OF NEVADA, THE ASSEMBLY CONCURRING, that the Nevada Legislature respectfully urges the Chief Justice and Associate Justices of the Supreme Court of Nevada to examine judicial accountability in this state and to consider measures which may enhance and allow greater public access to the administration of the judicial branch and foster public confidence and trust in the court system in this state.

S. Con. Res. 10, 68th Leg., 1995 Nev. Stat. 2884-85.

When read in full, it is clear that the purpose of Senate Concurrent Resolution No. 10 was to promote the public's trust and respect for the judiciary by having the courts adopt measures of public accountability and, more specifically, by having the courts conduct their matters in public, not in secret, thereby providing the public with "access to information concerning the daily operation of each courtroom in this state and the professional activities of the judges who serve in them." *Id.* at 2884. The resolution did not contemplate or empower the initiation by a panel of this court of a far-reaching investigation into who leaked information to the media regarding the panel's secret proceedings. If anything, the resolution blamed secret proceedings for the public's loss of confidence in the judiciary.

Moreover, the appointment of the special master in this case was not in accord with procedures typically employed in the appointment of such an official. The appointment of the special prosecutor in the Watergate case provides an example of how an independent investigator is properly appointed. In that case, Archibald Cox was appointed as a special prosecutor by the United States Attorney General pursuant to a statute authorizing the Attorney General to do so. *See* Matter of Application for Appoint. of Ind. Counsel, 596 F. Supp. 1465, 1469 (E.D.N.Y. 1984) (concluding that, with regard to cases in which Watergate

defendants had requested a federal district court to appoint a special prosecutor "there is no statute under our Federal System which authorizes this Court to appoint a special prosecutor. Such statutory authority as exists applies only to the authority of the Attorney General of the United States to appoint 'special attorneys' in the exercise of his discretion. 28 U.S.C. 515."), *order vacated on other grounds*, 766 F.2d 70 (2d Cir. 1985). Additionally, the duties of the special prosecutor were specifically limited by the Attorney General, and extraordinary measures were taken by the United States Congress and the Attorney General to insure the independence of the special prosecutor. Congressional Quarterly Weekly Report, Vol. 31, No. 21, May 26, 1973, at 1313-14. Finally, the Special Prosecutor was paid with public funds and made his reports to the public, and not just to the Attorney General who appointed him. *Id.* at 1314.

Compared to the appointment of the Watergate Special Prosecutor and other special prosecutors and investigators, it is apparent that the investigation at issue, apart from being illegal and completely unauthorized as detailed above, suffered from other serious maladies. First, the scope of the investigation was too broad and the special master given too much authority. The order was not specifically limited and seemingly subjected anyone and anything to investigation as the special master saw fit. Additionally, the special master was purportedly given judicial immunity and the power to administer oaths, take depositions, and subpoena people and documents. The effect of this order was to confer massive powers upon the private investigator with no safeguards or measures for accountability. Such a situation placed both investigatory (i.e., executive) power and adjudicative power into the hands of a panel of this court, thereby presenting a situation which this court has previously disallowed because it permits the judge to " 'behave with all the violence of an oppressor.' " *Galloway*, 83 Nev. at 19, 422 P.2d at 242 (quoting City of Enterprise v. State, 69 P.2d 953, 957 (Or. 1937)).

That Respondent Justices would even appoint a special master who acted under their control to conduct an investigation into the information leaks is surprising given the Whitehead panel's decision in Whitehead v. Comm'n on Jud. Discipline, 110 Nev. 874, 878 P.2d 913 (1994). In that case the panel removed the Attorney General from the Whitehead matter largely because the Attorney General was acting as both a prosecutor in front of the Judicial Discipline Commission and as legal advisor to the Judicial Discipline Commission, an adjudicative body. *Id.* at 885, 878 P.2d at 917-18. Therefore, the panel concluded that the Attorney General was unconstitutionally exercising the power of both the executive branch and the judicial branch. *Id.* at 880, 878 P.2d at 917. The

panel also stated that the Attorney General had a conflict of interest by acting in both capacities and stated that "[i]n our adversarial system, we have always been scrupulous about keeping adjudicative functions separate from the prosecutive functions, and fairness requires that we continue to do so." *Id.* at 885, 878 P.2d at 920. However, only a few pages later in that same opinion, the panel decreed that it was appointing a special master who would be under the panel's control and would investigate who leaked information to the media in violation of the panel's order of confidentiality. *Id.* at 890, 878 P.2d at 923. Such a situation invested both investigatory (i.e., executive) and adjudicative functions into the hands of a panel of this court, thereby creating the same unconstitutional exercise of power and the same conflict of interest which the panel had decried just pages earlier.

A second problem with the appointment of the special master was that the special master was not an independent authority as is generally contemplated by the term "master." The special master was under the control of the Whitehead panel, and the order authorized the special master to seek direction from the Whitehead panel whenever warranted. Additionally, JUSTICES STEFFEN and SPRINGER admitted that they personally paid the fees incurred by the special master after State funding was cut off. Nevada Attorney General, Frankie Sue Del Papa v. The Honorable Thomas L. Steffen, et al., Docket No. 27847 (Response to Petition for a Writ of Prohibition or in the Alternative for a Writ of Mandamus at 22, January 29, 1996). This fact obliterates any belief that the special master acted independently of the wishes or desires of the respondent members of the Whitehead panel.

The fact that the special master's fees were paid from the personal funds of JUSTICES STEFFEN and SPRINGER is a most disturbing aspect of the investigation. By initiating the investigation to seek out and punish those who leaked to the media information which casts them in a negative fashion, and by privately financing that investigation, it strongly appears that JUSTICES STEFFEN and SPRINGER hijacked the awesome power of this court to further their own personal vendettas and not, as they claimed, to discover why the public had lost confidence in the judiciary.

Furthermore, by paying for the investigation with personal funds, Respondent Justices apparently violated the due process of those accused of wrongdoing by the special master. In the case of In re Ross, 99 Nev. 1, 14, 656 P.2d 832, 840 (1983), this court

determined that the Nevada Board of Governors, the body responsible for the finances of the bar association, acted as the fact finder in a quasi-judicial attorney discipline proceeding and that the significant costs of its investigation would be recoverable from the attorney only upon a finding of misconduct. Therefore, the court concluded that the Board of Governors had a financial interest in finding misconduct on the part of the attorney and that the discipline proceeding apparently violated the attorney's due process rights.

The same decision can be applied to the investigation authorized by the Whitehead panel. Here, JUSTICES STEFFEN and SPRINGER had a direct financial interest in the investigation as they were paying for it from their personal funds. Just as "[f]airness . . . requires an absence of actual bias in the trial of cases," In re Murchison, 349 U.S. 133, 136 (1955), fairness also requires an absence of actual bias in the investigation of cases. Because the Justices who authorized the investigation also paid for it, they created a situation "'which would offer a possible temptation to the average man as judge . . . not to hold the balance nice, clear and true between the State and the accused.'" *Id.* (quoting Tumey v. Ohio, 273 U.S. 510, 532 (1927)). Such a situation amounts to a violation of due process and will not be permitted.

The payment of private funds for an allegedly public investigation effectively sidesteps the protection of NRS 353.260(2), which prohibits public officials from obligating a public body for expenses not expressly provided by law.[3] Respondent Justices did not seek or receive legislative authorization to spend state money on their investigation. By launching the probe without fiscal authorization and then paying for a portion or all of the expense incurred, Respondent Justices clearly maneuvered around the prohibition of NRS 353.260(2) by paying the cost themselves and may have violated the law in the process. *See* NRS 353.260(4).[4]

Finally, the administration of the court system resides in the Chief Justice and the other four elected members of the supreme court. If this had been an investigation within the jurisdiction of this court to authorize, it would still have required three of the five elected justices to approve this administrative action. Again, such authority was lacking.

---

[3]NRS 353.260(2) provides that "it is unlawful for any state officer, commissioner, head of any department or employee of this state to bind, or attempt to bind, the State of Nevada or any fund or department thereof in any amount in excess of the specific amount provided by law, or in any other manner than that provided by law, for any purpose whatever."

[4]NRS 353.260(4) provides: "Every officer of the State of Nevada, elective or appointive, who violates any of the provisions of this section shall be guilty of malfeasance in office."

## CONCLUSION

The orders of the Whitehead panel mandating confidentiality in the Whitehead proceedings before this court were invalid and therefore unenforceable. Further, Respondent Justices lacked constitutional or legislative authority to appoint a special master to investigate the leaks of information to the press regarding the secret proceedings. Accordingly, we grant Petitioner's petition for a writ of prohibition, and we direct the clerk of this court to issue a writ of prohibition to the Respondents directing them to cease and desist from any further action in the investigation launched in Supreme Court Case No. 24598 by the appointment of a special master to determine the source of news leaks and the reason for this court's lost prestige.

YOUNG, SHEARING, and ROSE, JJ., concur.