587 S.E.2d 356

Fountain Inn and Simpsonville Municipal Court
Judge William G. WALSH, Respondent.

No. 25722.

Supreme Court of South Carolina.

Submitted Sept. 2, 2003.
Decided Sept. 29, 2003.

Henry B. Richardson, Jr., and Deborah Stroud McKeown, both of Columbia, for Office of Disciplinary Counsel.

William G. Walsh, of Simpsonville, Pro Se.

PER CURIAM:

In this judicial disciplinary matter, respondent and the Office of Disciplinary Counsel have entered into an Agreement

for Discipline by Consent pursuant to Rule 21, RJDE, Rule 502, SCACR. In the agreement, respondent admits misconduct and consents to the imposition of any sanction set forth in Rule 7(b), RJDE, Rule 502, SCACR. We accept the agreement and remove respondent from office. The facts, as set forth in the agreement, are as follows.

## *Facts*

### I. *Intemperate Behavior Matters*

A defendant, who had been charged with failure to stop for a stop sign, appeared before respondent for a bench trial. After the State presented its case in chief, the defendant and his wife testified and asserted the defendant had, in fact, stopped for the stop sign. Respondent, *sua sponte*, asked the officer if he had a videotape of the stop. The officer informed respondent that he had a videotape but that he would have to locate it. Respondent then stated to the defendant, "All right, I'll go you double or nothing. Okay? If I play the tape and find that you did not stop you will pay, as a fine, not only what is written on the ticket, but that amount again for not telling me the truth." After viewing the tape, respondent found it was clear the defendant did not stop at the stop sign. Although the defendant still believed he had come to a complete stop, he stated, "Write the ticket up."

Thereafter, respondent asked the defendant if he had any questions and the defendant stated, "At this point, I think I need to keep my mouth shut." Respondent threatened to charge the defendant with contempt. Respondent shouted in a loud and harsh voice, "Are you going to defy me [defendant]? [Wife], tell your husband unless I see a 100—no wait-a 180 degree change in his attitude in five seconds I'm going to lock him up for contempt of court. I'll be damned if I'm going to have you or anyone else make a complete total mockery, do you understand me, sir?" Respondent continued to berate the defendant in a loud and harsh tone for his continued belief that the tape showed he came to a stop. Respondent stated, "You don't deserve to be driving ... [y]ou drive badly and you lied to me." When the defendant's wife asked to speak, respondent stated, "... I don't know how much credibility you have ... I gave you an out. I gave him an out. Your

attitude, run the tape. I'm not going to run a tape unless I know exactly what's going to happen, okay? I'm not that stupid. You are, you didn't figure out that I had an idea of what goes on?"

Respondent further chastised the defendant for challenging the word of the officer, stating, "Didn't an officer under oath swear that you did not stop?" Respondent's question suggested a predisposed bias toward the testimony of an officer over defendants. Respondent again told the defendant he was "stupid."

Respondent now recognizes that (1) in requesting a tape after the parties had rested their respective cases, and after the officer had elected not to offer the tape, respondent assisted the officer in the prosecution of the defendant; (2) his "double or nothing" proposal would tend to cause defendants to waive their right to plead not guilty and to proceed with a bench trial; (3) defendants can be "mistaken" without "lying"; and (4) it was inappropriate under any circumstances for respondent to say "I'll be damned," call a defendant "stupid," lose his temper or appear to lose his temper, or shout in a loud, demeaning tone while holding court.

On two other occasions, respondent displayed similar intemperate behavior. In one instance, after releasing the jury at the conclusion of a trial, respondent screamed at the defendant who had been tried, told her how ashamed he was of her and asked her "who the hell" did she think she was.

In another instance, a defendant appearing before respondent informed respondent that his mother, who had accompanied him to court, had recently undergone serious surgery and that, as a result of the surgery, she was wearing a colostomy bag. The defendant's two children were also present. The respondent addressed the defendant, who had no prior criminal record, in a harsh tone, told the defendant he did not care about the condition of the defendant's mother, and sentenced the defendant to three days in jail. The defendant's mother took respondent's tone to be loud, harsh, and angry and reported that respondent raised his voice and growled while addressing the defendant. Respondent represents that he consistently gives a small amount of jail time for simple possession of marijuana, as well as for several other offenses

he considers serious, as is within his discretion to do. He further represents that he is stern and harsh with defendants as part of their punishment and in an attempt to rehabilitate them.

Respondent acknowledges that he has, in the past, often and regularly talked loudly, sternly and demeaning to defendants. Respondent initially represented to Disciplinary Counsel that he felt this was appropriate because it was his responsibility to see to the correction of defendants and that it was part of their punishment that respondent was charged with imposing.[1] Respondent now acknowledges that shouting, belittling and cursing in the presence of defendants is inconsistent with the Code of Judicial Conduct.

## II. *Roll Call Matters*

In March or April 2003, respondent initiated a procedure in both Simpsonville and Fountain Inn Municipal Courts pursuant to which defendants charged with magisterial level offenses who requested jury trials were required to appear in respondent's court once a week and answer a "jury trial roll call" at the conclusion of the other business of the court even when no jury trials were scheduled on those dates and even when no term for jury trials had been scheduled.[2] The defendants were required to appear on the date the bench trial had originally been scheduled and once a week thereafter until there was a disposition of their case or an attorney made an appearance on their behalf. Initially, respondent handled this procedure by issuing subpoenas to the defendants. Thereafter, respondent prepared a form for use in both the Simpsonville and Fountain Inn Municipal Courts.

---

1. On one occasion, respondent stated in open court, "It's purposely cold in here. I don't want it comfortable in here. In fact, I'm thinking about taking out chairs and just putting in hard benches. It's intentionally uncomfortable, that's part of the punishment aspect." Respondent now acknowledges that such comments were inappropriate and indicated a bias towards those who elected not to forfeit bond and were awaiting trial.

2. On one occasion, respondent heard approximately seventeen cases and then had "jury trial roll call." On another occasion, respondent heard approximately twenty-five cases before having "roll call."

On April 17, 1985, the Chief Justice of the South Carolina Supreme Court issued an administrative order for magistrate and municipal courts which provides, in part, "... that a person charged with a ... traffic offense triable in a ... municipal court may make written demand for jury trial prior to the time and date set for bench trial, and the case shall be forthwith continued until the next available time reserved for jury trials, thereby relieving defendant of the responsibility for the appearance at the originally scheduled bench trial." This order is a part of the Magistrate's and Municipal Court Judge's Bench Book provided to each and every magistrate and municipal court judge by South Carolina Court Administration. Respondent was, upon appointment, given a copy of the Bench Book containing the administrative order. Respondent recognizes that (1) the "jury trial roll call" procedure he implemented is in violation of that order; (2) requiring defendants to appear at previously scheduled bench trials after they have requested a jury trial is in violation of the administrative order; (3) he was without authority to issue subpoenas for "jury trial roll call" and that doing so was in contravention of the administrative order; (4) he was without authority to issue orders requiring defendants to appear for "jury trial roll call" and that doing so was in violation of the administrative order; and (5) it was inappropriate to coerce defendants to obtain an attorney, especially for minor traffic offenses, and inappropriate to treat defendants without attorneys different from those with attorneys.

One defendant, who was charged with not having a brake light, requested a jury trial. The defendant appeared at approximately three "roll calls." On one occasion, respondent stated "... you've requested a jury trial ... you will be here every Tuesday until your case is called, your case is tried, or an attorney sends notice of representation. You will be here for roll call ... you requested a jury trial. You're being called every Tuesday for roll call until the case is tried ... Okay? It's that simple."

On one occasion, the defendant requested to be excused early after appearing in a timely fashion for "roll call." He was held in contempt and sentenced to twenty-four hours in jail. This occurred after respondent learned that the defendant had asked to be allowed to answer roll call prior to the

conclusion of the other business of the court to tend to some personal business the defendant felt was pressing. Respondent represents the sentence for contempt was warranted because the defendant was disrespectful to the court. The record indicates that respondent stated to the defendant, "You're the one who asked for a jury trial. You're gonna waste the city's money on a jury trial? You don't think that I, a judge, would give you a fair hearing? You want a jury to hear it? You want to cost the city all that money for a jury? You're the one making a big deal of it!.... So you think a jury trial is fair, so that means you don't think I can be fair.... You've got things you've got to do so you come in and you mouth off, you mouth off to the Clerk of Court, you mouth off to the administrative judge and you come in my courtroom with an attitude...." Then respondent asked the ministerial judge, "What do you think would be appropriate for [defendant]?" The ministerial judge stated he thought "[t]wenty-four hours" was appropriate. Respondent then asked the clerk, "Okay, madam clerk, what do you think would be appropriate?" The clerk responded, "The same." Thereafter, respondent sentenced the defendant to twenty-four hours in jail. Respondent now recognizes that this was an inappropriate delegation of his judicial authority and that he compromised the independence of the judiciary by soliciting input on the disposition of the matter from the ministerial judge and the clerk of court and by indicating that the ministerial judge and the clerk of court were in a special position to influence the judge.

The following week, the defendant appeared as required for "jury trial roll call" and respondent was advised that the defendant had withdrawn his request for a jury trial. Respondent proceeded to hear the case and dismiss the brake light charge against the defendant. The defendant advised Disciplinary Counsel that he withdrew his request for a jury trial to avoid having to come to "roll call" each week, to avoid hiring an attorney for an alleged brake light violation, and because he felt he could not get a fair trial from respondent.

A second defendant, who had been charged with a speeding violation and had requested a jury trial, was told to be in court on the date his bench trial had originally been scheduled. On that date, no jury trials were scheduled or held. Respondent

suggested to the defendant that he might want to withdraw his request for a jury trial. When the defendant elected not to do so, respondent issued a subpoena requiring the defendant to appear again the following week despite the fact that no jury trials were scheduled or held on that date. This process continued for two weeks. When the defendant appeared on the third occasion, respondent demanded that the defendant provide his social security number to be included on the "jury trial roll call" order. When the defendant objected to providing that information, respondent threatened the defendant with contempt of court.[3] It was the defendant's contention that the use of a person's social security number for such purposes is proscribed by federal law. Respondent is now aware that such is the case.

On the same date, respondent issued an order directing the defendant to appear in court at 10:00 a.m. every Tuesday thereafter until the completion of the trial of his case or receipt by the court of a letter of representation from an attorney. Under this arrangement, the defendant was required to appear approximately ten times for "jury roll call," sit through the other business of the court and then be excused until the next week. The only reason given by respondent for requiring the appearances was to "... make sure we don't lose track of each other."

Numerous other defendants who requested a jury trial were also required to appear before respondent on the date set for their bench trials and to appear for "jury trial roll calls" every Tuesday for weeks thereafter. On each occasion, roll was called at the conclusion of the other business before the court and the defendants were then allowed to leave the court with the requirement that they be back at the same time each week until their cases were concluded or they obtained the services of an attorney to represent them on their charges. The roll call requirement caused some defendants to travel long distances on a weekly basis and caused others to be absent from

---

3. Respondent required the first defendant, despite the defendant's wish not to do so, to recite the details of his earlier incarceration to the second defendant and all those present in the courtroom. After hearing the first defendant recite the circumstances of his incarceration, the second defendant relented and gave respondent his social security number.

their jobs. At least three defendants who either did not appear on the date of their originally scheduled bench trial or who did not appear for "jury trial roll call" were tried in their absence and convicted of the offenses with which they had been charged.

Respondent maintains the purpose of the "jury trial roll calls" was to "keep track" of defendants who often ended up not availing themselves of the jury trials they had requested. In addition, respondent contends that, while awaiting roll call, defendants would be educated about respondent and his court and many would determine respondent was lenient and fair and that it would be in their best interest to withdraw their request for a jury trial and instead let their case be concluded by a bench trial before respondent. Respondent now recognizes that, in addition to being contrary to the plain language of the administrative order, the "jury trial roll call" procedure acted to deter persons from exercising their right to a trial by jury and their right to be released on bond pending trial.

### III. *Pre-trial Conference Matters*

Prior to the holding of jury trials, *pro se* defendants were served with subpoenas requiring that they attend pre-trial conferences. No such subpoenas were served on the prosecutor or police officers; however, witnesses and victims were subpoenaed. At the pre-trial conferences, respondent sat on the bench and the *pro se* defendants were required to enter into discussions with the prosecutor for the State. Respondent maintains he did not conduct the conferences, but instead they were conducted by the prosecutor. Respondent now recognizes that this arrangement is suggestive of a bias toward the State, that there is no statutory authority authorizing the issuance of such subpoenas, that it was inappropriate to issue such subpoenas for the convenience of the State and not that of defendants, that it was inappropriate for respondent to issue subpoenas requiring defendants' presence at the conferences and then allow the prosecutor to conduct the conferences, and that this mandatory, one-sided appearance conflicted with the directives of the administrative order.

### IV. *Juror Dismissal Matter*

A juror who had two young children and could not find anyone to care for them while she was on jury duty brought

them with her to respondent's court. The juror advised a court employee of her situation. The employee told the juror that she had to go into the courtroom and discuss the matter with respondent. When the juror entered the courtroom, respondent, in a loud and harsh tone, told her she could not bring the children into the courtroom, pointed his finger at her and told her to leave. The juror reported back to the employee and was again instructed she had to go into the courtroom and discuss the matter with respondent. When the juror explained to the employee that respondent had just told her to leave the courtroom, the employee told the juror to go home. The events were very embarrassing to the juror. Respondent represents that he was harsh with the juror because she was late to court, she should have brought up the issue of the lack of adequate care for the children prior to the date of jury service, and she should have left the children unattended in the hall and come into his courtroom without the children to address the issue of being excused from jury duty. Respondent is now aware that, pursuant to S.C.Code Ann. § 14–78–50, the juror was, as a matter of law, entitled to be excused from jury duty, that his staff should have advised the juror of the requirement of providing an affidavit as required by the statute, and that it was respondent's responsibility to have such issues addressed without respondent causing embarrassment to potential jurors under such circumstances.

## V. *Prior Disciplinary History*

Respondent has received letters of caution from the Commission on Judicial Conduct on two prior occasions for conduct similar to that set forth in the Agreement for Discipline by Consent.

### *Law*

Respondent admits that the conduct set forth above constitutes a violation of the following Canons of the Code of Judicial Conduct, Rule 501, SCACR: Canon 1 (a judge shall uphold the integrity and independence of the judiciary); Canon 2 (a judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities); Canon 2(A)(a judge shall respect and comply with the law and shall act at all

times in a manner that promotes public confidence in the integrity and impartiality of the judiciary); Canon 2(B)(a judge shall not convey or permit others to convey the impression that they are in a special position to influence the judge); Canon 3 (a judge shall perform the duties of judicial office impartially and diligently); Canon 3(B)(2)(a judge shall be faithful to the law and maintain professional competence in it); Canon 3(B)(4)(a judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity); Canon 3(B)(5)(a judge shall perform judicial duties without bias or prejudice); Canon 3(B)(7)(a judge shall accord to every person who has a legal interest in a proceeding the right to be heard according to law); Canon 3(C)(1)(a judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business); and Canon 3(C)(2)(a judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge).

Respondent also concedes that his misconduct constitutes grounds for discipline under the following provisions of the Rules for Judicial Disciplinary Enforcement, Rule 502, SCACR: Rule 7(a)(1)(it shall be a ground for discipline for a judge to violate the Code of Judicial Conduct); Rule 7(a)(5)(it shall be a ground for discipline for a judge to be habitually intemperate); and Rule 7(a)(7)(it shall be a ground for discipline for a judge to willfully violate a valid court order issued by a court of this state).

### *Conclusion*

We find, based on respondent's history of intemperate behavior in the courtroom, his failure to modify his behavior after previous letters of caution, and his failure to abide by an administrative order of the Chief Justice, that removal from office is warranted. *See In the Matter of Dearman*, 277 S.C. 394, 287 S.E.2d 921 (1982)(magistrate removed from office due to habitual intemperance). It is therefore ordered that respondent be removed from office as of the date of the filing of this opinion.

**REMOVED.**

TOAL, C.J, WALLER, BURNETT and PLEICONES, JJ., concur.

MOORE, J., not participating.