IN THE MATTER OF THE HONORABLE ELIZABETH HALVERSON, DISTRICT JUDGE, COUNTY OF CLARK, STATE OF NEVADA.

No. 49876

November 1, 2007 169 P.3d 1161

*Arrascada & Arrascada, Ltd.*, and *John L. Arrascada*, Reno; *Gentile DePalma, Ltd.*, and *Dominic P. Gentile* and *William H. Gamage*, Las Vegas, for Judge Elizabeth Halverson.

*Dorothy Nash Holmes*, Carson City; *David F. Sarnowski*, Executive Director, Carson City, for Nevada Commission on Judicial Discipline.

Before the Court EN BANC.[1]

## OPINION

By the Court, MAUPIN, C. J.:

### INTRODUCTION

This appeal raises several issues of first impression concerning a rarely used but formidable power available to the Nevada Commission on Judicial Discipline: its constitutional and statutory authority to temporarily suspend a judge, before conducting a formal hearing with accompanying due process protections, when the Commission determines that the judge poses a "substantial threat of serious harm to the public or to the administration of justice."[2]

In considering this appeal, we resolve several novel issues concerning the procedures to be used and the standards to be applied when the Commission undertakes to exercise this authority, as well as the fundamental issue of whether to uphold the Commission's decision.

### SUMMARY OF DECISION

Under the Nevada Constitution, the Commission has discretion to impose an interim suspension; accordingly, we review the Commission's decision for an abuse of that discretion. Purely legal issues, however, are reviewed de novo. With respect to whether a judge's conduct justifies an interim suspension in order to protect the public or the administration of justice, the misconduct upon which the suspension is based must pose a current threat of harm. In determining whether a current threat exists, the Commission should consider the totality of the circumstances, based on the information available to it. This consideration may include a wide array of past misconduct. Past misconduct not demonstrating a current threat of harm does not, however, form an appropriate basis for an interim suspension.

Additionally, the Commission is authorized to impose an interim suspension during any stage of its proceedings, both before and after issuance of a formal statement of charges. Thus, the Commission's temporary suspension of Judge Halverson before formal

---

[1]THE HONORABLE MARK GIBBONS, Justice, and THE HONORABLE MICHAEL CHERRY, Justice, voluntarily recused themselves from participation in the decision of this matter.

[2]NRS 1.4675(3); *see also* Nev. Const. art. 6, § 21(9).

proceedings were commenced was permissible. Further, the statutory standard applicable to this matter, permitting a temporary suspension when a judge poses a "substantial threat of serious harm to the public or to the administration of justice," is neither vague nor ambiguous.

As the Commission's procedures thus far have accorded Judge Halverson due process, we reject her challenges to the suspension on this basis. We caution the Commission, however, that it must remain mindful of the time that passes after a temporary suspension is imposed and before a full hearing on formal proceedings takes place, for procedural safeguards that are adequate in light of the provisional nature of a temporary suspension will not suffice when that suspension takes on the attributes of more permanent discipline.

In the instant case, the record demonstrates that the Commission did not abuse its discretion in determining that the totality of the circumstances justified the interim suspension of Judge Halverson on the four grounds identified by the Commission: (1) inability to adequately conduct criminal trials; (2) abusive behavior toward court personnel, including sexual harassment and creating a hostile work environment; (3) falling asleep on the bench; and (4) failure to cooperate with colleagues and court administration. We therefore affirm the Commission's suspension order.

### FACTS

Newly elected Judge Elizabeth Halverson took the bench in Department 23 of the Eighth Judicial District Court, Clark County, in January 2007. Upon receiving documentation approximately four months later describing concerns with Judge Halverson's judicial performance and treatment of staff, Commission General Counsel David Sarnowski prepared an informal written complaint, which was filed with the Commission on April 25, 2007.[3] The Commission subsequently met by telephone and decided to commence an investigation. Additionally, based upon the information received, the Commission concluded that Judge Halverson posed a substantial threat of serious harm to the public and to the administration of justice and that an interim suspension was therefore warranted. The Commission filed its initial written suspension order on May 10, 2007, identifying six bases for its decision. In proceeding this way, the Commission failed to give Judge Halverson seven days' notice of the suspension, as required by Commission on Judicial Discipline Rule 9(2).

---

[3]This written complaint simply commenced the Commission's informal, confidential inquiry into Judge Halverson's conduct. *See* NRS 1.4655(1)(a); *cf.* NRS 1.467(2) and (3) (providing that a formal discipline proceeding commences when the Commission determines that the evidence supports a reasonable probability that grounds for disciplinary action exist and a "*special prosecutor*" files a formal statement of charges).

Upon receiving the suspension order, Judge Halverson requested a hearing. The Commission granted the request and stayed the suspension order pending the hearing.[4] The matter thus remained confidential at that time under NRS 1.4683, which requires that all Commission proceedings remain confidential until the Commission makes a probable cause determination and a formal statement of charges is filed. In anticipation of the hearing, the Commission appointed a special prosecutor.

The Commission issued several witness subpoenas at the request of the special prosecutor and offered to issue subpoenas for Judge Halverson as well. Judge Halverson then requested that a number of subpoenas duces tecum issue to certain district court judges, several Clark County employees, and a number of district court staff members; these subpoenas requested production of all documentation on personnel grievances filed against all Nevada judges since January 1, 2004. The appointed hearing chair, Sixth Judicial District Court Judge Richard Wagner, directed, without explanation, that Judge Halverson's requested subpoenas not issue.[5] He later explained that the requests were overbroad, unduly burdensome, and requested information that was irrelevant to the proceedings. Judge Wagner also noted that the requests included information and documents concerning other employees, which would be confidential.

At the hearing, the Commission indicated that the special prosecutor bore the burden of demonstrating by a preponderance of the evidence that an interim suspension was warranted, based on the totality of the circumstances, and that Judge Halverson bore no burden. It then allocated three and a half hours to the special prosecutor and two and a half hours to Judge Halverson to present their respective cases. The court reporter monitored the time each side expended on witness examination, objections, and arguments on objections. At the end of the hearing, the special prosecutor had expended a few minutes more than Judge Halverson, but not the full extra hour allotted to the prosecutor. Accordingly, the parties took approximately the same amount of time in presenting their respective cases.

Following the hearing, the Commission deliberated and then announced its findings. Of the six grounds identified in its original suspension order, the Commission held that four had been proved

---

[4]As discussed below, the Commission is not required to afford a judge a hearing before suspending the judge. The Commission, however, has the option to grant a suspension hearing.

[5]Based on the Commission's refusal to issue the subpoenas, Judge Halverson filed a writ petition in this court, asking, among other things, that the hearing be stayed until she had been provided due process in the form of the subpoenas she had requested, sufficient time to prepare, and a proper allocation of the burden and of the time for each side to present its case. This court denied the petition, while noting that the burden of demonstrating that an interim suspension was warranted rested solely upon the special prosecutor.

by a preponderance of the evidence: (1) "Judge Halverson is without sufficient legal abilities to conduct trials in criminal cases"; (2) "Judge Halverson has failed to perform the duties of judicial office impartially and diligently in that there is substantial evidence that she has not treated staff and litigants with patience, dignity or courtesy," and "she has treated staff to [sic] a hostile work environment and sexual harassment to the extent that there is a serious threat to the administration of justice"; (3) "Judge Halverson has failed to diligently perform her duties by falling asleep at least on one occasion and possibly more while on the bench during a jury trial"; and (4) "Judge Halverson [has] failed to diligently carry out the duties of her office [by] failing to cooperate with other judges and court administrators." The Commission then determined that Judge Halverson posed a substantial threat of serious harm to the public and to the administration of justice and accordingly imposed an interim suspension. The evidence relating to each of the four stated bases for the suspension is described below.

### Ability to conduct criminal trials

A Clark County Deputy District Attorney testified about a criminal child molestation case that she had prosecuted before Judge Halverson. Specifically, the deputy district attorney described her discovery, after watching a videotape shown by Judge Halverson, that Judge Halverson had dined and conversed with the jury over the course of its two-day deliberation, outside the presence of either attorney in the case. The tape confirmed that, after reading a standard admonishment that the jury should not discuss the matter until the case was formally submitted, Judge Halverson asked the jurors if they had any questions. She then answered several questions about criminal procedure, evidence in the case, and the reliability of a child witness (the victim in the case), as well as other topics. The deputy district attorney asserted before the Commission that, due to Judge Halverson's ex parte jury contact, the defense moved for a mistrial, which was denied. The record indicates that the jury subsequently could not reach verdicts on thirteen of the twenty-three counts tried in the case, and rendered verdicts of acquittal on the remaining ten counts.

Judge Stewart Bell, Presiding Criminal Judge in Clark County, also testified regarding Judge Halverson's ability to conduct criminal trials. Judge Bell's testimony revealed that he had cautioned Judge Halverson concerning ex parte jury communications before she engaged in such communications with the jury from the child molestation case. In particular, after presiding over an earlier case, Judge Halverson sought Judge Bell's opinion concerning her interaction with the jury, explaining her belief that counsel in that case had misled her into making ex parte contact with the jury. After re-

viewing the case, Judge Bell specifically told Judge Halverson that she should not have any ex parte contact with juries. Following this conversation, however, he learned that Judge Halverson had engaged in ex parte communication with another jury in a subsequent case, apparently the child molestation prosecution discussed above.

Judge Bell testified that he was part of a three-judge committee appointed by the Chief Judge to counsel Judge Halverson, after the Chief Judge received complaints about Judge Halverson's handling of jury trials and personnel issues. One of the committee's recommendations, implemented by the Chief Judge, was to limit Judge Halverson to a civil-only caseload. But under the Eighth Judicial District Court Rules, a judge with a civil-only caseload may still be assigned criminal overflow cases.[6] According to Judge Bell, he received a complaint about how Judge Halverson had handled the only criminal overflow case assigned to her after she was given an all-civil caseload. Judge Bell emphasized the potential impact of Judge Halverson's mistakes in criminal cases, noting that the State has no right to appeal in order to correct errors resulting from judicial misconduct. Judge Bell also indicated that all but one "contract" defense attorney had refused to work in Judge Halverson's department.[7]

Finally, according to her former bailiff, Judge Halverson occasionally went to the jury room to talk to juries without counsel present. The former bailiff also mentioned that Judge Halverson brought cookies to juries and ate dinner with them on several occasions, stating that she wanted to be "liked" by the jurors. Additionally, he testified that, on occasion, Judge Halverson told the court recorder[8] to delete portions of the record, impliedly on occasions when she had made ill-considered remarks.

### Failure to treat staff and litigants with respect

Judge Halverson's former bailiff was the primary witness concerning the claims of staff mistreatment. He testified that, when he interviewed with Judge Halverson for the bailiff position, she advised him of the expected work hours, 8:00 a.m. to 5:00 p.m., and

---

[6]See EDCR 1.80 (providing that a civil-only judge may be designated to preside over a criminal trial if that judge is not currently presiding over a civil trial).

[7]Because the number of criminal cases in the Eighth Judicial District is significant, many private attorneys have agreed by "contract" to defend criminal defendants when the Clark County Public Defender has a conflict of interest. These substitutions occur frequently, so contract attorneys are a vital part of Clark County's criminal justice system.

[8]In the Eighth Judicial District Court, a court recorder operates a recording system to record court proceedings, in lieu of a traditional court reporter's transcription equipment.

that he would be required to assist her with certain tasks due to her disabilities.[9] Nevertheless, according to the former bailiff, after he was hired, she required him to arrive at work at 6:30 a.m., and often required him to stay until 6:00 or 7:00 p.m., until Judge Halverson's husband arrived to take her home.

The former bailiff further testified that his duties on a typical day included, on Judge Halverson's directive, helping her change her shoes, dealing with her oxygen tanks, preparing and serving her lunch, and covering her with a blanket and placing another under her head for a pillow when she rested in her chambers. Often, the former bailiff stated, Judge Halverson refused to let him take breaks or lunch hours, so that he would be available to attend to these and other personal tasks. According to the bailiff, Judge Halverson also shouted at him on a daily basis about his perform-ance of her personal tasks or anything else that did not please her, which might include the temperature of her ice water, her lunch, or papers on her chambers floor (which she sometimes had deliber-ately thrown for him to pick up).

The former bailiff also stated that Judge Halverson publicly em-barrassed or humiliated him on multiple occasions and that based on Judge Halverson's comments and conduct towards him, he filed discrimination claims against her. In addition to mentioning an off-color comment Judge Halverson made to his fiancée, the former bailiff related two incidents. First, on one occasion, Judge Halver-son stated that her neck hurt, and she asked him if he knew any-thing about massage; she then asked him to rub her neck. Next, in the car on the way to a judicial luncheon, Judge Halverson leaned toward him and rested her arm on his shoulder during the ride.

Judge Halverson's former judicial executive assistant (JEA) also testified concerning ethnic slurs or inappropriate comments made by the judge, stating that Judge Halverson called her law clerk a "faux Jew" because she did not regularly attend temple services, and derisively referred to someone else as a "Mick," which of-fended the law clerk, who has an Irish heritage. Testimony from both the former bailiff and the former JEA further indicated that Judge Halverson often verbally abused her husband in front of her staff and that she frequently used profanity.

The former JEA testified that she worked on Judge Halverson's election campaign and actively supported her. Her testimony indi-cates that shortly after Judge Halverson took office, however, their relationship deteriorated. She testified that Judge Halverson re-peatedly made derogatory statements about other judges and main-tained that she was the only competent judge in the courthouse.

---

[9]Because of disabilities and/or health conditions that are not clearly de-scribed in the record, Judge Halverson uses a motorized scooter and requires the use of oxygen. Personal tasks that might be required of her bailiff, then, could include assisting with her oxygen tanks and other lifting or helping her with access difficulties that might arise.

The former JEA further testified that, after the first month or so, she was not permitted to speak with lawyers because Judge Halverson said that they were all crazy, and that Judge Halverson imposed a similar prohibition on her law clerk. The former JEA's testimony echoed the former bailiff's testimony concerning Judge Halverson's habit of raising her voice at staff almost constantly, except when on the bench.

According to Judge Bell, much of the above information was relayed to the appointed three-judge committee during its meeting with the staff, and when the committee subsequently met with Judge Halverson, "she didn't seem to either understand or want input" and placed much of the blame for the complaints on staff.

At the hearing, four other staff members testified on Judge Halverson's behalf. These staff members worked for Judge Halverson at various times between late April and the time of the hearing, after her first set of staff had resigned or been reassigned. One of them filled in after Judge Halverson's court recorder left in April; this staff member later worked as Judge Halverson's JEA for a short time. She testified that she never observed Judge Halverson shout at any employee and attributed the department's poor working environment to the former JEA. She further testified that, to her knowledge, none of the newer staff members were asked to perform personal tasks for Judge Halverson, such as changing shoes, fixing her lunch, or rubbing her neck.

Judge Halverson's court clerk[10] at the time of the hearing testified that she provided no personal assistance to Judge Halverson, that the judge conducted herself in a professional manner toward all staff, that she never heard Judge Halverson raise her voice at anyone, and that she never heard Judge Halverson use profanity. The clerk, an African American, indicated that Judge Halverson never made any disparaging remarks based on race or treated her in a discriminatory fashion, and never asked her to alter her court minutes in any way. The court clerk further testified that other court clerks who have filled in for her on occasion have remarked that Judge Halverson is pleasant to work for. Finally, the court clerk, who began working for Judge Halverson while the former JEA and bailiff were still in that department, testified that she never observed Judge Halverson treat either of them badly.

Judge Halverson's JEA at the time of the hearing testified that she assisted Judge Halverson with few or no personal tasks, that Judge Halverson treated her professionally and did not "yell" at her, and that Judge Halverson never engaged in ill treatment of other staff. She stated that Judge Halverson was "probably one of the nicest and well-informed attorneys—judges I've ever worked for." She further stated that she was unaware of any other staff hav-

---

[10]Among other things, court clerks assigned to the various departments take minutes of court proceedings.

ing difficulty working for Judge Halverson, including relief clerks and administrative bailiffs.[11]

Finally, Judge Halverson's court reporter at the time of the hearing stated that Judge Halverson treated him courteously, had never raised her voice to him or to other employees, and was courteous to litigants and counsel.

### Falling asleep on the bench

The deputy district attorney in the child molestation case testified that Judge Halverson had fallen asleep on the bench during the trial testimony before the jury. According to this witness, by that time, Judge Halverson had generated a reputation for falling asleep on the bench. Additionally, Judge Halverson's former bailiff testified that Judge Halverson fell asleep on the bench virtually every day. Although the former JEA's testimony did not reflect that Judge Halverson consistently slept while on the bench, the former JEA did testify that she had seen Judge Halverson dozing on a few occasions, and that on one occasion, she was called in by the former bailiff and a former court clerk because they could not awaken her.

With respect to this one occasion, the former bailiff and former JEA gave differing accounts as to Judge Halverson's views on why she had fallen asleep. The former bailiff testified that she claimed that her blood pressure "must be going up" and that she "did not feel well." The former JEA testified that Judge Halverson blamed the problem on medication "that did not agree with her" and also on the former JEA's failure to "let her take a long enough nap" in chambers before trial proceedings recommenced. Judge Halverson did not testify at the hearing, but she did submit an affidavit to the Commission, which indicated that she lapsed into slumber on one occasion because of low blood sugar arising from her diabetes and her failure to eat. Although the record demonstrates that the occasion of sleeping described in Judge Halverson's affidavit did not occur during the criminal trial, as depicted by the deputy district attorney, the record does not specify whether or not this instance of sleeping was the same as that described by Judge Halverson's former staff.

The only testimony contradicting the testimony about Judge Halverson's propensity to sleep while on the bench was the statement given by the JEA working for Judge Halverson at the time of

---

[11]Relief clerks and administrative bailiffs are Clark County employees who are available to substitute for an Eighth Judicial District Judge's own staff when that staff is on leave or who fill in on a short-term basis when a vacancy occurs.

the hearing that, in her two months with the judge, she had never seen the judge fall asleep on the bench.

The Commission's written order noted that one confirmed occasion of falling asleep on its own would not warrant an interim suspension, but that when added to the other conduct, her sleep issues formed part of the basis for its decision. Additionally, the Commission noted that although a physical reason could explain Judge Halverson's sleep issues, the judge had not offered any proof regarding the possible etiology of this tendency.

*Cooperation with court administration*

Charles Short, Court Administrator for the Eighth Judicial District Court, explained that security at the Regional Justice Center is provided, in part, by the judges' bailiffs, who serve at-will and are hired by the individual judges. According to Mr. Short, until May 9, 2007, when Judge Halverson brought two private security guards to court, he was unaware of any judge hiring private security. He also noted a disruption that occurred when Judge Halverson placed an emergency 9-1-1 telephone call from her chambers, also on May 9. Short's testimony was consistent with that proffered by an administrative bailiff who, at the Las Vegas Metropolitan Police Department's request, performed a welfare check on Judge Halverson in response to the emergency call. Judge Halverson apparently made this call when Short, the former JEA, a videographer and several bailiffs entered her chambers so that the former JEA could search for items she claimed to be personal property.[12]

Short further testified that, when Judge Halverson's former bailiff was reassigned to other duties, an administrative bailiff was assigned to her department until a new bailiff could be hired. Several of the administrative bailiffs did not wish to work in Judge Halverson's department and had to be threatened with discipline for insubordination before they would take the assignment. For that reason, Short kept the assignments of short duration, often one or two weeks.

Mr. Short's duties include tracking statistics for the court, including those concerning peremptory challenges of judges.[13] From the time that Judge Halverson took the bench in January 2007, through June 2007, she was challenged 199 times; the next most

---

[12]*See Halverson v. Hardcastle*, 123 Nev. 245, 255 n.4, 163 P.3d 428, 436 n.4 (2007).

[13]Under SCR 48.1, either side in a civil case may exercise one peremptory challenge of the judge assigned to the case. No reason for the challenge is necessary or permitted, the judge is not aware of who exercised a challenge, and the case is reassigned to a different judge.

frequently challenged judge was challenged 48 times under this procedure. Short summarized the great impact that this volume had on the court, from the clerk's office, which files the challenges, collects the fees, and transmits them to this court, to the chief judge, who must then reassign the case to another judge and assign a different case to the challenged judge, to equalize caseloads. He acknowledged, however, that a judge has no actual control over an attorney's decision to file a challenge and that new judges typically draw more challenges.

According to Short, Judge Halverson's treatment of staff and the consequent staff turnover have caused morale problems at the court. In addition to his difficulties in obtaining administrative bailiffs for Judge Halverson's department, Short recounted problems in procuring temporary workers for her court recorder and clerk positions because staff members were reluctant to work for Judge Halverson. Finally, Mr. Short explained that media inquiries concerning Judge Halverson impacted the court's workload. Short admitted, however, that Judge Halverson had a slightly above-average civil caseload, that she resolved a backlog that was present when she took the bench, and that she was up-to-date on her orders and decisions and had no backlog of matters under submission.

Finally, in identifying another example of Judge Halverson's failure to cooperate with court administration, the former bailiff testified that Judge Halverson refused to allow him to take required training or to assist the other bailiffs at the main entrance, even when his presence in chambers was not required.

As noted, based on the evidence related to these four grounds, the Commission imposed an interim suspension. This appeal followed.

## DISCUSSION

In this case, we address numerous issues concerning the procedure to be followed and the standards to be applied in judicial interim suspension cases. First, we consider the interplay between the confidentiality of commission proceedings and the public nature of proceedings before this court. Second, we review Nevada legislative provisions governing the interim suspension of judges and resolve several procedural issues: the standard of review that we apply to appeals from temporary suspension orders, the standard of proof that the Commission must use in temporary suspension proceedings, the appropriate scope of Commission suspension proceedings, and the tests to be applied when determining whether an interim suspension is warranted. Third, we examine and ultimately reject Judge Halverson's assertion that the Commission lacks statu-

tory authority to impose an interim suspension before a formal statement of charges is filed. Fourth, we consider the interim suspension statute and determine that it allows and sets forth a sufficiently clear standard for suspension, and is thus not void for vagueness. Fifth, we consider and reject Judge Halverson's arguments that she has been denied due process, but we note that the analysis of this issue could change if the Commission unduly delays its processing of Judge Halverson's case. Finally, we conclude that, under the appropriate standards, the Commission's decision should be affirmed.

*Confidentiality*

Preliminarily, we address the interplay between NRS 1.4683(1), providing for confidentiality of all Commission proceedings until formal charges are filed, and NRS 1.090, requiring proceedings in this court to be public. Here, the Commission entered its suspension order before any formal statement of charges was filed. Accordingly, its hearing on the suspension was closed and all documents filed with the Commission or submitted at its hearing remain confidential. Because, however, a suspension order may be appealed to this court of public record, we necessarily harmonize these statutes as they apply to an appeal arising from confidential Commission proceedings.

Before 1997, the Commission was governed by rules promulgated by this court. One of those rules provided that Commission proceedings remained confidential until a formal statement of charges was filed. In *Attorney General v. Steffen*,[14] we held that this rule did not apply to proceedings in this court, particularly in light of NRS 1.090's mandate that, with only limited exceptions, all courts of justice be open to the public:

> The scope of the [rule concerning confidentiality] is restricted to "the confidentiality of all proceedings *before the Nevada commission on judicial discipline* . . . ." [The view that the rule applies to proceedings in this court] disregards not only the right and need of the public to know of such an extraordinary dispute in governmental affairs but also the threat that secret judicial proceedings pose to public confidence in this court and the judiciary.[15]

After our opinion in *Steffen* was issued, Article 6, Section 21 of the Nevada Constitution was amended to vest the Legislature with

---

[14]112 Nev. 369, 373-74, 915 P.2d 245, 248 (1996).

[15]*Id.* (quoting former Rule 1 of the Administrative and Procedural Rules for the Nevada Commission on Judicial Discipline (alteration in original)).

authority to provide for confidentiality of Commission proceedings. Consequently, the Commission rule in effect at the time *Steffen* was issued was repealed, and the Legislature enacted a nearly identical statute to replace the repealed rule.[16] Given that the amendment to Article 6, Section 21 made no changes concerning confidentiality of proceedings before this court, *Steffen* remains the controlling authority with respect to appeals from confidential Commission rulings.

In *Steffen*, we contemplated the possibility that a compelling government interest could conceivably justify sealing documents in this court.[17] But here, neither the Commission nor Judge Halverson has identified any such compelling interest and neither has asked that any document in this case be sealed. Moreover, although Commission on Judicial Discipline (CJD) Rule 9(4) requires the Commission to promptly file only a "notice of suspension" with this court, thus enabling the Commission to maintain, to the greatest extent possible, the confidentiality of proceedings that predate formal charges, the Commission in this case chose to file a complete copy of the actual suspension order. While the Commission submitted the order "under seal," it did not contemporaneously file an application to seal the document, with authority and argument setting forth why the document should be sealed. Nor have the parties addressed this matter's confidentiality in their briefs.

As our holding in *Steffen* continues to guide us with respect to confidential judicial discipline matters considered by this court, all of the documents filed in this matter, for which no compelling interest in support of sealing has been proffered, are public documents.

### Legal standards applicable to interim suspension matters

Judge Halverson's appeal in this matter involves the first contest of an interim suspension order issued by the Commission, at least since a revised judicial discipline scheme was instituted in 1997. Accordingly, this case raises several issues of first impression.

To begin, the authority to suspend sitting judges arises from three sources: the Nevada Constitution, NRS Chapter 1, and rules promulgated by the Commission. First, Article 6, Section 21(9) of the Nevada Constitution provides that "[t]he commission in its discretion may suspend a justice or judge from the exercise of [her] office pending the determination of the proceedings before the commission." Second, NRS 1.4675, based on ABA Model Rule of Disciplinary Enforcement 15, provides, in pertinent part, that the

---

[16]NRS 1.4683.

[17]*See* 112 Nev. at 374, 915 P.2d at 248.

Commission may suspend a judge if the judge "poses a substantial threat of serious harm to the public or to the administration of justice":

> 3. The Commission may suspend a justice or judge from the exercise of office with salary if the Commission determines, pending a final determination in a judicial disciplinary proceeding, that the justice or judge poses a substantial threat of serious harm to the public or to the administration of justice.
>
> 4. A justice or judge suspended pursuant to this section may appeal the suspension to the Supreme Court for reconsideration of the order.

Third, CJD Rule 9 provides, in pertinent part, that the Commission must give a judge seven days' notice of its intention to suspend the judge and that the Commission has discretion to grant a suspension hearing:

> 1. The commission may suspend a justice or judge from the exercise of the office in accordance with NRS 1.4675 . . . .
>
> 2. The commission shall give the respondent 7 days' notice of its intention to suspend. The justice or judge may submit documents in opposition to suspension which shall be considered by the commission. A hearing may be granted upon request of the respondent in the sole discretion of the commission.

As these provisions set forth almost no procedural standards, several procedural issues must be resolved.

### Standard of review

We review purely legal issues, including issues of constitutional and statutory construction, de novo.[18] The correct standard of proof to be used by a tribunal is a legal question, thus subject to our de novo review.[19] Accordingly, we determine these issues without deference to the Commission's decision.

With respect to the Commission's ultimate determination to suspend Judge Halverson, Article 6, Section 21(9) provides that the

---

[18]*Seino v. Employers Ins. Co. of Nevada*, 121 Nev. 146, 149, 111 P.3d 1107, 1110 (2005).

[19]*See Milton v. State, Dep't of Prisons*, 119 Nev. 163, 164, 68 P.3d 895, 895 (2003) (explaining that an argument that the district court applied the wrong legal standard raises a pure question of law, subject to de novo review).

Commission may suspend a judge during a judicial discipline pro-
ceeding "in its discretion." Thus, since the Commission's decision
to suspend is a discretionary act, we review the decision for an
abuse of that discretion.[20] We have previously held that a tribunal
abuses its discretion when, among other things, it applies an in-
correct legal standard.[21]

*The Commission properly applied a preponderance of the
evidence standard of proof*

Although generally, the standard of proof in judicial discipline
matters is clear and convincing evidence,[22] the Commission applied
a test of whether, by a preponderance of the evidence, the totality
of the circumstances demonstrated that an interim suspension was
warranted. We conclude that the Commission applied the correct
burden of proof at the suspension phase of these discipline
proceedings.

Other courts have applied a preponderance standard at the early,
temporary suspension phase of judicial discipline proceedings. For
example, the court in the Pennsylvania case of *In re Jaffe*[23] noted
that a difference exists between a determination of "guilt" or
"innocence," which is made during formal proceedings, and a de-
termination that an interim suspension is warranted to protect the
integrity of the judiciary pending resolution of the case, and thus,
a lower standard of proof at the interim suspension stage is appro-
priate. Similarly, the Florida Supreme Court has concluded that the
question in judicial interim suspension cases is not one of guilt or
innocence, but the seriousness of the charges against the judge and
the consequent effect on public confidence in the judiciary.[24]

Given the different purposes of an interim suspension and a final
adjudication of judicial misconduct, we conclude that the Com-
mission applied the proper standard for determining whether an in-
terim suspension is warranted: whether, by a preponderance of the

---

[20]Notably, other courts have also determined that the decision whether to
impose an interim suspension is a discretionary act. *See In re Shenberg*, 632
So. 2d 42 (Fla. 1992); *In re Kirby*, 350 N.W.2d 344 (Minn. 1984); *In re Jaffe*,
814 A.2d 308 (Pa. Ct. Jud. Discipline 2003).

[21]*Bergmann v. Boyce*, 109 Nev. 670, 674, 856 P.2d 560, 563 (1993).

[22]*See* NRS 1.467(1) (requiring the Commission to assess "whether there is
a reasonable probability that the evidence available for introduction at a formal
hearing could clearly and convincingly establish grounds for disciplinary ac-
tion" before instituting formal charges); CJD Rule 25 (establishing a clear and
convincing evidence standard at the formal hearing stage); *Matter of Mosley*,
120 Nev. 908, 912, 102 P.3d 555, 558 (2004).

[23]814 A.2d at 317-18.

[24]*Shenberg*, 632 So. 2d at 47 (citing *Matter of Brennan*, 483 N.E.2d 484
(N.Y. 1985)).

evidence, the totality of the circumstances demonstrates that a judge poses a substantial threat of serious harm to the public or to the administration of justice.

*The Commission properly considered the totality of Judge Halverson's conduct*

Judge Halverson argues that the Commission improperly considered the testimony of former employees who, by the time of the hearing, had not worked for Judge Halverson for over two months. According to Judge Halverson, an interim suspension is warranted only when a judge poses a "current and future" threat of harm; thus, she maintains, the older evidence of past conduct described by Commission witnesses was irrelevant to the suspension proceedings. More particularly, Judge Halverson contends that she does not pose any current or future threat, because no evidence was presented that she has behaved improperly since May 10, 2007, the date that the Commission issued its original suspension order.

The Commission's inquiry centered upon whether the totality of the circumstances indicated that an interim suspension was warranted to protect the public or the administration of justice. Accordingly, the Commission indicated that it would consider evidence from the time that Judge Halverson took the bench in January 2007 up to the day before the hearing.

The Commission based its standard on that described in *In re Jaffe*.[25] In *Jaffe*, the court indicated that it would consider each case on its own merits based on the totality of the circumstances, including the nature of the conduct charged, its relation or lack thereof to the duties of the responding judicial officer, the impact or possible impact on the administration of justice, the harm or possible harm to public confidence in the judiciary, and any other relevant circumstances.[26]

Other courts have also identified factors relevant to a temporary suspension determination: the West Virginia Supreme Court's list includes whether the alleged misconduct is directly related to the administration of justice or the public's perception of the administration of justice, whether the conduct is entirely personal in nature or involves the judge's "public persona," whether the conduct involves violence or a callous disregard for the justice system, whether criminal conduct is involved, and any aggravating or mitigating circumstances.[27] Similarly, the Michigan Supreme Court has

---

[25] 814 A.2d 308.

[26] *Id.* at 317-18.

[27] *In re Cruickshanks*, 648 S.E.2d 19, 23 (W. Va. 2007).

enumerated several useful factors that equate to a totality of the circumstances approach, including whether the conduct is part of a pattern or practice, whether misconduct occurred on the bench, whether the misconduct is prejudicial to the actual administration of justice or to the appearance of impropriety, whether the misconduct was premeditated or deliberate rather than impulsive, any remorse or efforts by the judge to improve his or her conduct, the judge's discipline record and experience, and the effect the conduct has had on the integrity of and the public's respect for the judiciary.[28]

The Nevada statute's use of the word "threat" indicates that an interim suspension would not be appropriate if the alleged misconduct concerned only past actions, with no indication of an ongoing problem or likelihood that the misconduct would be repeated.[29] Thus, an interim suspension under NRS 1.4675(3) is warranted only to protect against anticipated future harm, including harm to the public's perception of the judicial system, and not merely to redress past misconduct; such a suspension is appropriate when the "exigencies of the circumstances presented" would not be adequately met by formal proceedings.[30]

But focusing the inquiry on whether a judge poses a current or future threat does not require the Commission to disregard evidence of past conduct that would indicate an ongoing problem. Past conduct is a reasonable basis upon which to predict future conduct, and we have expressly recognized this premise in several legal contexts.[31] The significance of Judge Halverson's apparently improved behavior in the two months immediately preceding the hearing, as opposed to her previous four months' conduct, was properly ad-

---

[28]*In re Chrzanowski*, 636 N.W.2d 758, 764 n.8, 765 n.11 (Mich. 2001).

[29]NRS 1.4675(3); *see Black's Law Dictionary* 1519 (8th ed. 2004) (defining "threat" as "[a]n indication of an approaching menace," or a "person or thing that might well cause harm").

[30]*In re Franciscus*, 369 A.2d 1190, 1194 (Pa. 1977).

[31]*See, e.g., Steward v. Steward*, 111 Nev. 295, 890 P.2d 777 (1995) (considering grandparent's past conduct in determining whether visitation was in child's best interest); *City Council of Reno v. Reno Newspapers*, 105 Nev. 886, 890, 784 P.2d 974, 976-77 (1989) (affirming injunction prohibiting future open meeting law violations based on city council's past conduct in violating the statute); *Haberstroh v. State*, 105 Nev. 739, 741, 782 P.2d 1343, 1344 (1989) (permitting " '[c]onsideration of a defendant's past conduct as indicative of his probable future behavior' " in assessing future dangerousness as part of sentencing determinations (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986))).

dressed by the Commission in determining whether a suspension was warranted.

*The Commission was authorized to impose an interim suspension* 

Judge Halverson asserts that the Commission lacks authority to temporarily suspend her.[32] She posits that, since no formal disciplinary charges have been lodged against her, the Commission is still in its "investigation" stage, and the matter is but an "inquiry," not a "proceeding" under NRS 1.4675(3), which authorizes the Commission to suspend a judge "pending a final determination in a judicial disciplinary proceeding." Judge Halverson's restrictive reading of NRS 1.4675(3), which would prohibit the Commission from temporarily suspending a judge until the prosecuting attorney files a formal statement of charges, is belied by the plain meaning of the term "proceeding."[33]

"Proceeding," according to *Black's Law Dictionary*, "means any action, hearing, investigation, inquest, or inquiry (whether conducted by a court, administrative agency, hearing officer, arbitrator, legislative body, or any other person authorized by law) in which, pursuant to law, testimony can be compelled to be given."[34] This definition covers *all* of the Commission's activities from the commencement of its inquiry regarding a judge's alleged misconduct.[35] Under NRS 1.466(1), the Commission is authorized at all of these stages, which constitute steps in one disciplinary proceeding, to issue subpoenas for the testimony of witnesses: "[d]uring any stage of a disciplinary proceeding, including, but not limited to, an investigation to determine probable cause and a formal hearing, the Commission may issue a subpoena to compel the attendance or testimony of a witness."[36]

---

[32]Judge Halverson also argues that NRS 1.467(3) provides for the appointment of a special prosecutor only after the Commission makes a finding of probable cause. But Article 6, Section 21(11)(a) of the Nevada Constitution states that the Commission may designate *for each hearing* an attorney to act as counsel to conduct the proceedings. Consequently, Judge Halverson's argument lacks merit.

[33]*See Pope v. Motel 6*, 121 Nev. 307, 314, 114 P.3d 277, 282 (2005) (noting that this court should follow a statute's plain meaning when the language is not ambiguous).

[34]*Black's Law Dictionary* 1204 (6th ed. 1990) (citing Cal. Evid. Code § 901).

[35]*See* NRS 1.4655(1) (providing that the Commission may commence an inquiry into alleged misconduct upon the receipt of a complaint or information from any source).

[36]*See also* NRS 1.4683(1) (stating that "all proceedings of the Commission must remain confidential until the Commission makes a [probable cause] determination").

Thus, although the Commission's activities are divided into informal, confidential measures[37] and formal, public actions,[38] all of its activities with respect to a set of concerns about a particular judge are part of a single judicial discipline proceeding. Once the Commission begins to investigate a judge's alleged misconduct after receiving a written complaint from any person or information from any source, a discipline proceeding has begun. At this point, the Commission possesses the authority to temporarily suspend the judge.[39]

In short, NRS 1.4675(3)'s grant of power in the Commission to "suspend . . . pending a final determination in a . . . proceeding" does not, by its terms, restrict that power to proceedings following issuance of formal charges. The power to suspend is not in aid of a formal complaint; rather, it is an express aspect of the Commission's duty to protect the public upon an investigation revealing a current, emergent threat to the judiciary.

### NRS 1.4675(3) is not unconstitutionally vague

Judge Halverson argues that NRS 1.4675(3) is unconstitutionally vague because it does not define "substantial threat of serious harm" to the public or to the administration of justice. We conclude that the statute sets forth a sufficiently clear standard for when a suspension may, in the Commission's discretion, be imposed.

We have previously explained that "[a] statute is unconstitutionally vague and subject to facial attack if it (1) fails to provide notice sufficient to enable persons of ordinary intelligence to un-

---

[37]See NRS 1.4655 (authorizing the Commission's investigation of alleged misconduct); NRS 1.4657(1) (explaining that the Commission must further investigate complaints that, if true, establish grounds for discipline); NRS 1.4667 (stating that, if the Commission determines that a sufficient reason exists to proceed against the judge, then the Commission must require the judge to respond to the complaint); NRS 1.467(3)(a) (providing that if, based on the response and other information, the Commission makes a finding that probable cause for discipline exists, the Commission must designate a prosecuting attorney to file a formal written statement); see also NRS 1.4683(1) (providing for confidentiality before a formal statement of charges is filed).

[38]See NRS 1.467 (providing for the filing of a formal statement of charges, a judge's response, and a formal public hearing).

[39]Nevada Constitition Article 6, Section 21(9) unequivocally states that "[t]he commission in its discretion may suspend a . . . judge from the exercise of [her] office pending the determination of the proceedings before the commission." See also NRS 1.4675(3); Halverson v. Hardcastle, 123 Nev. at 265, 163 P.3d at 442 (explaining that the Commission's power to take emergency action with respect to a judge's temporary suspension commences after the seven-day notice period for suspensions expires).

derstand what conduct is prohibited and (2) lacks specific standards, thereby encouraging, authorizing, or even failing to prevent arbitrary and discriminatory enforcement."[40] In particular, when evaluating statutes that apply only to a specific group, the enactment must give " 'fair notice to those to whom it is directed.' "[41] Thus, when evaluating a statute that applies only to judges, the issue is whether an ordinary judge could understand and comply with it.[42]

In other contexts, courts have rejected vagueness challenges to similar language. For example, the United States Court of Appeals for the Seventh Circuit concluded that lawyer disciplinary rules prohibiting lawyers from commenting publicly during a trial on certain matters that posed a "serious and imminent" threat of harm to the trial's fairness were sufficiently clear.[43] Also, the California Court of Appeal, in rejecting a vagueness challenge to a statute that permitted a mentally disordered sex offender's commitment to be extended upon a finding that the offender presented a "serious threat of substantial harm," noted that these words each has "a meaning commonly understood by people of reasonable intelligence."[44] In another case considering a vagueness challenge to the same statute, the California Court of Appeal approved reference to dictionary definitions for such words.[45]

"Substantial" means "real; not seeming or imaginary; not illusive,"[46] and "serious" means "[i]mportant; weighty; momentous, grave, great."[47] Thus, a suspension may be appropriate when the facts of a particular case indicate that a judge poses a real, rather than illusory, threat of great harm to the public or to the administration of justice.

We further note that NRS 1.4675 only provides a procedural mechanism for suspension; it does not itself prohibit any conduct.

---

[40]*Silvar v. Dist. Ct.*, 122 Nev. 289, 293, 129 P.3d 682, 685 (2006).

[41]*Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 437 (Tex. 1998) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972)).

[42]*Id.*

[43]*Chicago Council of Lawyers v. Bauer*, 522 F.2d 242 (7th Cir. 1975). The United States Supreme Court's later opinion in *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), does not affect this conclusion, since the language held to be vague in Nevada's then-governing trial publicity rule concerned a "safe harbor" provision not present in *Bauer. See id.* at 1048-50. Moreover, the *Gentile* Court actually upheld the proscriptive portion of the rule, prohibiting extra-judicial comments that "the lawyer knows or reasonably should know . . . will have a substantial likelihood of materially prejudicing an adjudicative proceeding." *See id.* at 1075-76.

[44]*People v. Martin*, 165 Cal. Rptr. 773, 779-80 (Ct. App. 1980).

[45]*People v. Henderson*, 166 Cal. Rptr. 20, 30-31 (Ct. App. 1980).

[46]*Black's Law Dictionary* 1428 (6th ed. 1990).

[47]*Id.* at 1367.

Rather, substantive restrictions on a judge's conduct, the violation of which may lead to an interim suspension, are set forth in the Code of Judicial Conduct. Judge Halverson does not argue that the Canons are impermissibly vague. We therefore reject Judge Halverson's vagueness challenge.

### Judge Halverson was accorded due process

Judge Halverson asserts three due process challenges in connection with the Commission's hearing. First, she argues that she was denied due process by the Commission's refusal to issue her requested subpoenas. Second, she maintains that the Commission had predetermined to suspend her when it entered the first, stayed order of suspension, thus depriving her of a fair hearing. Third, she contends that the Commission improperly allocated an additional hour of time to the special prosecutor, further denying her a fair hearing. We reject these arguments because, for purposes of a temporary suspension, due process was met by the Commission's procedures.

#### The Commission properly refused to issue the requested subpoenas duces tecum

Judge Halverson requested subpoenas duces tecum for several Clark County and Eighth Judicial District Court staff members, seeking documentation of all employee grievances against judges of any Nevada court since January 1, 2004. She also wished to subpoena a district judge involved in a recent judicial discipline matter. Judge Halverson sought these records to attempt to show that she was being singled out for more severe treatment than other judges. The Commission refused to issue the subpoenas for three reasons: much of the information sought concerned confidential personnel matters, Judge Halverson had not sufficiently established its relevance to the issue before the Commission—namely, whether Judge Halverson posed a substantial threat of serious harm warranting *her* interim suspension, and the requests were overbroad and burdensome.

We conclude that the Commission properly denied the requested subpoenas. In the criminal context, in which the defendant has greater interests at stake than those present in this context, this court has refused to authorize so-called "fishing expeditions":

> [T]he State is under no obligation to accommodate a defendant's desire to flail about in a fishing expedition to try to find a basis for discrediting a victim. As the Washington Supreme Court observed: "A defendant must advance some factual predicate which makes it reasonably likely the requested file

will bear information material to his or her defense. A bare assertion that a document 'might' bear such fruit is insufficient."[48]

As Judge Halverson failed to establish what relevant information she sought and a factual predicate for how the information would assist her defense to the claims that she, herself, constituted a substantial threat of serious harm to the public or to the administration of justice, the Commission properly refused to issue these subpoenas.

### *The Commission's decision was not predetermined*

Next, Judge Halverson argues that she was denied due process because the Commission had predetermined the outcome of the interim suspension hearing. The record, however, reflects that the Commission did not predetermine its suspension decision. First, the Commission went to the trouble and expense of appointing a special prosecutor, obtaining hearing space, and holding a day-long hearing. It was not required to take these measures.[49] Second, the Commission took the matter seriously and did not treat the hearing as a mere formality before the original suspension order went into effect. Indeed, the record demonstrates that the Commission wanted to hear evidence from both sides, that Judge Wagner's rulings on objections were even-handed, and that many of his evidentiary rulings, if anything, favored Judge Halverson. Most significantly, the Commission altered its decision: its original, stayed suspension order stated six grounds, based upon the complaint only, while its suspension order following the hearing deleted two of the grounds, finding the evidence insufficient to support them. And, the order following the hearing contains extensive discussion of the evidence presented. Accordingly, we reject Judge Halverson's argument in this regard.

### *The time allocation at the hearing was not unfair*

Finally, Judge Halverson maintains that the Commission denied her due process by allocating an additional hour of the hearing to

[48]*Sonner v. State*, 112 Nev. 1328, 1340-41, 930 P.2d 707, 715 (1996) (citation omitted) (quoting *State v. Blackwell*, 845 P.2d 1017, 1022 (Wash. 1993)), *modified on other grounds*, 114 Nev. 321, 955 P.2d 673 (1998); *see also Schlatter v. District Court*, 93 Nev. 189, 561 P.2d 1342 (1977) (disallowing, in the civil context, blanket discovery orders without regard to relevance).

[49]*See* Nev. Const. art. 6, § 21(9) (stating no hearing requirement for a temporary suspension); NRS 1.4675 (same); CJD 9(2) (providing that the decision whether to hold a hearing is within the Commission's sole discretion).

the special prosecutor to present her case. This argument likewise fails. Initially, we note that the time actually used by the special prosecutor was only a few minutes more than that allocated to Judge Halverson. Even considering the larger differences in time allocation, however, Judge Halverson was not denied due process.

In *Mathews v. Eldridge*,[50] the United States Supreme Court explained that whether procedural due process has been satisfied depends on a balance of three factors: (1) the private interest affected by the official action; (2) the risk of an improper deprivation of that private interest given the procedures used and any probable value of additional or different procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or different procedural requirements would necessitate.

Here, Judge Halverson's private interests at stake were more than negligible, but the procedures used adequately protected against the risk to them. While Judge Halverson's counsel made an offer of proof that he would have liked to present testimony from other witnesses, they fell into two categories: (1) witnesses who, like most of those who did in fact testify, would state that Judge Halverson is a pleasant supervisor who treats others with dignity and respect, and (2) witnesses who, like some of those who testified, contradicted other witnesses' testimony regarding Judge Halverson's abusive manner. Additional testimony in this vein would not have substantially reduced the risk of an unfair deprivation.

Also, the Commission's hearing took place in Las Vegas, for the convenience of Judge Halverson and the witnesses. As the Commission had no Las Vegas facilities, it was forced to operate under space availability constraints. It ultimately located space for a one-day hearing, and this space had to be vacated by 6:00 p.m. The Commission would arguably have suffered an unnecessary fiscal and practical burden if it had been compelled to obtain space for a multi-day hearing that was not even required under the pertinent statute or CJD rule. Also, the Commission's decision to allocate one additional hour to the special prosecutor, who bore the burden of proof, did not deprive Judge Halverson of due process. Finally, the essence of due process—"the opportunity to be heard 'at a meaningful time in a meaningful manner' "[51]—was clearly met in this case.

### Possible effect of further delay

Our foregoing analysis of the due process issues presented in this case presumes that the Commission proceeds with dispatch. If the

---

[50]424 U.S. 319, 334-35 (1976).

[51]*Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

Commission unduly prolongs its decision about whether to file formal charges, so that the suspension extends beyond what could reasonably be characterized as temporary, then the due process analysis could change. Specifically, as the first factor in *Mathews* becomes more significant, *i.e.*, as the private interest affected grows, the second factor is necessarily impacted—more procedural safeguards are needed.[52] A predeprivation hearing is not always necessary and a full post-deprivation hearing can satisfy due process when the length and severity of the deprivation is not serious, but as the length and severity increase, so does the need for full due process protections.[53] Thus, should the Commission unreasonably delay its investigation, then Judge Halverson may file a motion with the Commission to modify or vacate the interim suspension,[54] or she may seek writ relief from this court.

*The Commission did not abuse its discretion in imposing an interim suspension in this case*

The Commission based its temporary suspension decision on four grounds: (1) Judge Halverson's inability to conduct criminal trials, particularly her ex parte contacts with juries; (2) her abusive manner toward court staff; (3) her apparent habit of falling asleep on the bench; and (4) her failure to cooperate with her colleagues and court administrators. Each of these grounds is discussed in more detail below.

*Ex parte contact with juries violates the judicial canons and impairs Judge Halverson's ability to conduct criminal trials*

One of the grounds stated by the Commission for its decision to temporarily suspend Judge Halverson was her inability to conduct criminal trials. Judge Halverson argues that an interim suspension was not warranted on this ground because, after April 2007, she was assigned a civil-only caseload, so her ability to conduct criminal trials did not impact her ability to serve as a judge. But under EDCR 1.80, a civil-only judge may be assigned criminal overflow cases, and in fact, the record reflects that Judge Halverson was assigned an overflow criminal case in June 2007. At least one complaint pertaining to Judge Halverson's handling of this case was lodged. Also, in light of Mr. Short's testimony that Judge Halver-

---

[52]*Id.* at 341-42.

[53]*See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19 (1978) (explaining that a predeprivation hearing is not always required and that a post-deprivation hearing satisfies due process when the circumstances necessitate quick action, when the length and severity of the deprivation are not serious, and when the procedures underlying the decision to effect the deprivation sufficiently minimize the risk of an erroneous deprivation).

[54]*See* Commission Adopted Procedure 2 (governing motions).

son had no backlog on her regularly assigned cases, she would be likely to receive overflow cases. We thus conclude that the Commission properly considered evidence on this issue, despite Judge Halverson's civil-only caseload at the time of the hearing.

Our review of the record indicates that the Commission's conclusion concerning Judge Halverson's inability to conduct criminal trials is primarily based on her ex parte contact with juries, and so our discussion focuses upon that issue.

Canon 3B(2) of the Nevada Code of Judicial Conduct requires a judge to "be faithful to the law and maintain professional competence in it." In addition, Canon 3B(11) and its commentary caution judges with respect to jury contact, indicating that only an expression of appreciation for the jurors' service is appropriate. Nevada's criminal procedure statutes also prohibit contact with jurors except in limited circumstances, most notably that any such contact be recorded and in the presence of counsel.[55] Similarly, our decisions involving a judge's ex parte contact with a jury have clearly explained that such contact was improper, even when under the circumstances of a particular case, reversal was not warranted.[56]

Here, the record reveals that Judge Halverson persistently engaged in improper contact with juries that were deliberating in cases tried in her department. Testimony at the hearing indicated that, on several occasions, she dined with jurors or brought them cookies, and in at least one case, she engaged in an extensive discussion of substantive legal issues pertinent to the matter before the jury. A judge's desire to be "liked" cannot preempt the parties' right to a fair trial. Ex parte contact with a deliberating jury is clearly unacceptable. Unlike in civil cases, in which both sides have a right to appeal and thus may raise any improper contact at the appellate stage, the State has no right to appeal in criminal cases, so no error correction is available. Further, Judge Halverson's continuation of her improper behavior, after having been advised by another district judge to avoid ex parte jury contact, warranted the Commission's conclusion that her conduct was unlikely to improve, thus supporting the imposition of a temporary suspension, at least with respect to criminal cases.

---

[55]See NRS 175.451; see also NRS 175.391 (emphasizing that juries are to be protected from outside influences); NRS 175.401 (requiring admonitions when a jury is permitted to separate or depart for home overnight).

[56]See Archanian v. State, 122 Nev. 1019, 1035, 145 P.3d 1008, 1020 (2006), cert. denied, 127 S. Ct. 3005 (2007); Daniel v. State, 119 Nev. 498, 510-11, 78 P.3d 890, 898-99 (2003); Cavanaugh v. State, 102 Nev. 478, 729 P.2d 481 (1986).

*Abusive conduct toward staff violates judicial canons*

Canon 3B(4) requires a judge to be "patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity." Also, Canon 3B(5) prohibits "words or conduct manifest[ing] bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, [or] national origin." Many cases nationwide hold that abusive conduct toward court personnel, including the use of racial, ethnic, or religious epithets, is inappropriate and is properly subject to judicial discipline.[57] For example, in *Matter of Del Rio*,[58] the Michigan Supreme Court upheld judicial discipline, including an interim suspension, for misconduct that included abusive and discourteous conduct to counsel, litigants, witnesses, and court staff. Similarly, the judge in *Matter of Ross*,[59] a Maine case, was temporarily suspended based on conduct that included using abusive, intemperate, and vulgar language to litigants. Also, while not involving an interim suspension, the California Supreme Court in *In re Stevens* censured a judge for using racial and ethnic epithets to

---

[57]*In re Carpenter*, 17 P.3d 91 (Ariz. 2001) (removing judge for racist, sexist, and obscene comments, among other things); *Matter of Ackel*, 745 P.2d 92 (Ariz. 1987) (stating that use of profanity and sexual innuendo brings judicial office into disrepute), *overruled on other grounds by In re Jett*, 882 P.2d 414 (Ariz. 1994); *In re McAllister*, 646 So. 2d 173 (Fla. 1994) (removing judge for, among other things, sexually harassing her judicial assistant and being abusive to counsel); *Matter of Inquiry Concerning a Judge No. 481*, 307 S.E.2d 505 (Ga. 1983) (disciplining judge for repeated flippant and derogatory remarks); *In re Inquiry Concerning Holien*, 612 N.W.2d 789 (Iowa 2000) (imposing discipline for rude, disrespectful, and hostile treatment of fellow judges, counsel, litigants, and court staff); *In re Seitz*, 495 N.W.2d 559 (Mich. 1993) (disciplining judge for unprofessional relationship with and hostile attitude towards employees and judicial colleagues, including using offensive and obscene terms); *In re Complaint Against Jones*, 581 N.W.2d 876 (Neb. 1998) (imposing discipline for profane, abusive, vulgar, and threatening language); *In re Brown*, 907 A.2d 684 (Pa. Ct. Jud. Discipline 2006) (disciplining judge for repeatedly using racial and ethnic slurs in staff's presence, treating female staff members in a demeaning manner, indecorous behavior toward staff, loud public criticism of staff, and engaging in loud angry outbursts, including pounding fists, slamming doors, and throwing files); *In re Zoller*, 792 A.2d 34 (Pa. Ct. Jud. Discipline 2002) (imposing discipline for demeaning, impatient, undignified behavior to constables, including use of vulgarities and profanity, and angry, loud, confrontational behavior); *In re Walsh*, 587 S.E.2d 356 (S.C. 2003) (removing judge for intemperate behavior and failure to abide by Chief Judge's administrative orders); *Disciplinary Proceedings Against Buchanan*, 669 P.2d 1248 (Wash. 1983) (imposing discipline for verbal and physical sexual harassment and religious slurs).

[58]256 N.W.2d 727 (Mich. 1977).

[59]428 A.2d 858 (Me. 1981).

court personnel, even though the judge performed judicial duties free from actual bias.[60]

In this case, the record reveals that Judge Halverson frequently yelled at her staff, regularly used vulgarities, and on several occasions employed pejorative racial, ethnic, or religious terms. Witness testimony also indicates that Judge Halverson publicly humiliated her former bailiff on several occasions.

Judge Halverson argues that, since the staff employed by her at the time of the hearing testified that she treated them with courtesy and respect, she cannot pose a current or future threat in this regard. In this, Judge Halverson appears to argue only that her behavior poses no current or future threat *to current or future employees*. But an interim suspension is not imposed to protect court staff, but rather to protect the public and the administration of justice. An effective justice system requires public confidence in the judiciary's integrity. As stated by the Michigan Supreme Court in *Del Rio*, "it is important not only that the integrity of the judiciary be preserved but that the appearance of that integrity be maintained."[61]

Here, Judge Halverson's then-current staff testified that she treated them well, but these later employees did not contradict the testimony of her earlier employees that she treated them extremely poorly. The former employees' testimony reveals a pattern of abusive behavior during Judge Halverson's first four months. Thus, although the evidence presented at the hearing does not suggest that Judge Halverson poses a current threat to her staff, it does support a determination that her conduct constitutes a continued threat of harm to the public's perception of the judicial system. We therefore conclude that, under the totality of the circumstances, the Commission did not abuse its discretion in determining that an interim suspension was justified on this basis.

> *Evidence that Judge Halverson fell asleep on the bench was properly considered*

 ■ ■

Canon 3 provides that a judge "shall perform the duties of judicial office impartially and diligently." Clearly, a judge does not perform diligently by sleeping on the bench. If the record reflected that Judge Halverson had fallen asleep on the bench only once or twice, and if evidence in the record demonstrated that she had taken steps to address any underlying health problem causing her lethargy, then this ground would likely not warrant an interim suspension. But testimony at the hearing, although disputed, indi-

---

[60]645 P.2d 99 (Cal. 1982); *see also Buchanan*, 669 P.2d 1248 (censuring former judge for repeatedly losing his temper, making improper ethnic comments, and sexually harassing employees).

[61]*Del Rio*, 256 N.W.2d at 753.

cated that Judge Halverson fell asleep "every day." In addition, with respect to the one occasion that Judge Halverson admits to falling asleep, the record reveals that she offered three different explanations at different times to different people: an adverse reaction to medication, low blood sugar, and a blood pressure problem.[62] Thus, although the Commission did not utilize the evidence of Judge Halverson's propensity to fall asleep on the bench as an independent basis for suspension, the Commission did not abuse its discretion in considering this evidence when determining, under the totality of the circumstances, that an interim suspension was warranted.[63]

### *Failure to cooperate with court administration violates judicial canons when it interferes with court functioning*

Judge Halverson argues that Canon 3C(1)'s language is permissive and not mandatory, since it states that a judge "should" cooperate with other judges and court officials. In its entirety, with emphasis added, Canon 3C(1) provides, "A judge *shall* diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business." When a judge's failure to cooperate with court administration rises to the level that court functioning is adversely impacted, the judge is properly subject to discipline.[64]

Here, testimony at the hearing reveals a panoply of behavior by Judge Halverson that disrupted the Eighth Judicial District Court's functioning. For example, her ex parte contact with juries may have resulted in at least one hung jury, requiring a new trial with its accompanying expense and delay. Her refusal to permit her bailiff to assist the administrative bailiffs resulted in a greater burden on the administrative bailiffs and the bailiffs from other departments. Her retention of private security guards and her subse-

---

[62]The Commission recognized in its interim suspension order that "there may well be a physical reason for [Judge Halverson having fallen asleep] and possibly for having done so multiple times. However, no proof was offered by Judge Halverson regarding the possible etiology of the sleeping-in-court propensity and the Commission has yet to obtain any medical report of its own that might shed light on the situation."

[63]*Carpenter*, 17 P.3d 91 (removing judge for sleeping on the bench, among other things).

[64]*Holien*, 612 N.W.2d 789 (imposing discipline for rude, disrespectful, and hostile treatment of fellow judges, counsel, litigants, and court staff because it adversely impacted court administration); *Seitz*, 495 N.W.2d 559 (disciplining judge for unprofessional relationship with and hostile attitude towards employees and judicial colleagues, including failing to cooperate in administrative matters); *Walsh*, 587 S.E.2d 356 (removing judge for intemperate behavior and failure to abide by chief judge's administrative orders).

quent 9-1-1 call to local police wrought a degree of havoc with court administration on that particular day. Her staff difficulties required the attention of four fellow judges (the three judges on the committee and the chief judge), and yet her behavior did not improve until after she was served with the Commission's original interim suspension order. In light of Judge Halverson's conduct, administrative and relief staff refused to work or resisted working in her department, as did contract criminal defense counsel, resulting in uncommon difficulties for court administration attempting to provide her with staff. The extraordinarily high number of peremptory challenges against her required a corresponding effort by court administration to process the challenges and reassign cases as necessary.

To summarize, the record reflects that Judge Halverson's actions necessitated extensive efforts by other judges and court administrators to accommodate her shortcomings in an attempt to maintain the district court's proper functioning. The record reflects that, rather than supporting these efforts, Judge Halverson refused offers of assistance. Nothing in the record indicates that Judge Halverson had improved her conduct in this regard by the time of the hearing or that she had taken any steps to address this issue, and so the Commission did not abuse its discretion in concluding that an interim suspension was appropriate on this basis.

*The "totality of the circumstances" supports the Commission's decision*

A common thread running through judicial interim suspension decisions is the need to protect the integrity of and public confidence in the judiciary.[65] The cumulative effect of Judge Halverson's conduct was to seriously impair the functioning of the Eighth Judicial District Court. Judge Halverson's own Department 23, of course, bore the brunt of these ill effects, but the record reveals that her conduct impinged on court administration beyond simply her chambers and courtroom. Moreover, in light of Judge Halverson's rebuff to the three-judge committee's offer of assistance and guidance and her refusal to tender any explanation for her behavior or assurances that it would improve, the Commission was justified in finding that Judge Halverson's disregard of her duties under the Canons would continue. Finally, her behavior, documented before the Commission and widely discerned within the public domain, necessarily impacted the confidence that Nevadans

---

[65]*See, e.g.*, *Shenberg*, 632 So. 2d at 46; *Del Rio*, 256 N.W.2d at 734; *Kirby*, 350 N.W.2d at 349; *Miss. Com'n on Jud. Perf. v. Hartzog*, 822 So. 2d 941, 945 (Miss. 2002); *Franciscus*, 369 A.2d at 1194; *In re McCourt*, 633 S.E.2d 17, 19-20 (W. Va. 2006).

generally, and Clark County citizens in particular, have in their judiciary.[66] Thus, the Commission did not abuse its discretion in determining, based on the totality of the circumstances, that Judge Halverson's conduct rose to such a level that she posed a substantial threat of serious harm to the public and to the administration of justice, thus warranting her interim suspension.

## CONCLUSION

The interim suspension of a duly elected judge is a significant matter, and such a sanction should not be imposed lightly. Only when the Commission is satisfied that the threat posed by a judge cannot await the disposition of formal proceedings is such a powerful tool properly invoked, and the remainder of the discipline proceeding must progress with dispatch. In this case, the Commission did not abuse its discretion in determining that the evidence before it met the required standard. As noted by the Michigan Supreme Court, even an elected judge is entitled to sit only while he or she adheres to the position's requirements, including compliance with the Code of Judicial Conduct.[67] We therefore affirm the Commission's order.

HARDESTY, PARRAGUIRRE, DOUGLAS and SAITTA, JJ., concur.

---

[66]*See Chrzanowski*, 636 N.W.2d at 770 n.18 (rejecting judge's argument that discipline commission's recommended sanction was too harsh and was improperly based on publicity concerning her case, and noting that Michigan's Canon 2(A), which appears to be identical to Nevada Canon 2A and its commentary, specifically requires judges to avoid impropriety and the appearance of impropriety and warns them that they "must expect to be the subject of constant public scrutiny," while nevertheless cautioning the commission "to ensure that the attentions of the media upon particular judicial misconduct are placed in an appropriate perspective").

[67]*See Del Rio*, 256 N.W.2d at 734 n.6.